578 So.2d 624 (1991)
The STATE of Mississippi, ex rel. Michael C. MOORE, Attorney General of the State of Mississippi; Raymond Vecchio, Oliver E. Diaz, Jr., and Others Similarly Situated,
v.
Dick MOLPUS, Secretary of State of the State of Mississippi.
No. 90-CA-696.
Supreme Court of Mississippi.
April 3, 1991.
*625 Mike C. Moore, Atty. Gen., Stephen J. Kirchmayr, Jr., Deputy Atty., and Wilson A. Carroll, *626 Sp. Asst. Atty. Gen., Jackson, for appellants.
*627 John C. Henegan, W. Wayne Drinkwater, Jr., J. Cal Mayo, Jr., Butler Snow O'Mara Stevens & Cannada, Constance Slaughter-Harvey, Reese J. Partridge, and Brian Wayne Wells, Office of Secretary of State, Jackson, for appellee.
En banc.
ROBERTSON, Justice, for the Court:

I.
Today's political cause celebre presents novel and important legal questions. We are asked to resurrect the long dormant Initiative and Referendum Amendment to the grant of legislative power within our Constitution and to give that amendment phoenix-like powers, all to the immediate end that the people may vote whether to repeal this state's constitutional ban on all lotteries. Deeper interests in stability, reliance and legal integrity loom large upon reflection.
The Circuit Court denied the claim. Law and prudence command that we stay our hand as well. We affirm.

II.

A.
Until recently, most had long forgotten that in its 1914 Regular Session, the Legislature, two-thirds of each House concurring, adopted House Concurrent Resolution No. 24. Miss. Laws, Ch. 520 (1914). The Resolution directed referral to the people of an amendment which would have enshrined in the Constitution an initiative and referendum ("I & R") petition procedure.[1]
The proposal would have vested in the electorate power to enact constitutional amendments and legislative measures ("Initiative") and the power to reject acts passed by the Legislature ("Referendum"). An Initiative petition, whether for a legislative measure or for a constitutional amendment, bearing the signatures of 7,500 qualified electors would have been placed on the ballot at the next succeeding statewide *628 election. A Referendum petition would have required only 6,000 signatures and would have had to be filed within ninety days after the adjournment of the legislative session during which the questioned measure had been passed. The Governor would have had no authority to veto any Initiative or Referendum approved by a majority of those voting on the measure, nor could any such measure have been subsequently repealed or amended, save by a vote of three-fourths of the members of each house of the Legislature.
H.C.R. 24 directed that the proposed I & R Amendment be submitted to the voters at the general election to be held on November 3, 1914,[2] "in accordance with the provisions of Section 273, of the Constitution,"[3] Miss. Laws, Ch. 520 (1914).
Following November 3, 1914, the Election Commissioners of the several counties compiled the returns of the election and certified them to the Secretary of State. These returns disclosed that 19,118 votes had been cast in favor of the I & R Amendment, while only 8,718 votes had been cast against it. The highest aggregate vote cast for any office voted for at the election was 37,583. In its 1916 Regular Session, the Senate adopted Senate Concurrent Resolution No. 18, directing that the amendment be inserted into the Constitution, and the House concurred on March 29, 1916.[4] The I & R Amendment was then formally inserted into the Constitution and appeared there as Article 4, Section 33 in I Hemingway's Mississippi Code 151-153 (1917).[5]
*629 The legal validity of the I & R Amendment was immediately brought under fire. In 1917 this Court considered the matter and held that the amendment had been properly submitted, ratified and added to the Constitution. State ex rel. Howie v. Brantley, 113 Miss. 786, 797-801, 74 So. 662, 666-67 (1917).
Five years later, certain citizens filed an initiative petition that the then seemingly exorbitant $40,000 annual salary of the State Revenue Agent be slashed. Understandably motivated that his pay not be cut, Revenue Agent Stokes V. Robertson pulled out all the stops. He argued that the petition attacking his salary must fail because the I & R Amendment had been submitted to the voters in a form that offended Section 273's mandate that such amendments shall "be submitted in such manner and form that the people may vote for or against each amendment separately...."[6] *630 The case reached this Court in record time and, Brantley notwithstanding and no doubt to the surprise of one and all, the Court did an about-face and held the I & R Amendment void on grounds it was in law "more than one amendment" and, contrary to Section 273, had been submitted in a form which combined in one measure the disparate subjects of legislative enactments and constitutional amendments. Power v. Robertson, 130 Miss. 188, 230-31, 93 So. 769, 775-77 (1922). Central to the Power decision was the notion that initiating or repealing legislation and amending of the Constitution "are separate and distinct things." In the end, the Court overruled Brantley and flatly held that the Initiative and Referendum Amendment was "unconstitutional and void." Power, 130 Miss. at 235, 93 So. at 777. There the matter lay, dormant, for lo these many years, a Rip Van Winkle or a Sleeping Beauty, depending on one's point of view.
In the past quarter century many of our sister states in search of sorely needed public revenues have begun operating lotteries. Mississippi's Constitution bans lotteries, Miss. Const. Art. 4, § 98 (1890),[7] and measures have been proposed to repeal the ban. The death of these measures in the 1990 legislative session gave birth to the present action.

B.
Our Plaintiffs are (1) Michael C. Moore, Attorney General of Mississippi, suing in his official capacity and in the name of the State of Mississippi; and two members of the Mississippi House of Representatives, (2) Raymond Vecchio, Representative, District 112, Jackson County, an adult resident citizen of Gautier, Mississippi; and (3) Oliver E. Diaz, Jr., Representative, District 116, Harrison County, an adult resident citizen of Biloxi, Mississippi. On March 28, these three presented Dick Molpus, Secretary of State of Mississippi, with an initiative petition calling for a public election on repeal of Section 98's lottery ban.[8] Secretary *631 Molpus refused the petition, as in law he was bound to do, given Power v. Robertson.
Later that same day, March 28, 1990, Plaintiffs filed suit in the Circuit Court for the First Judicial District of Hinds County. Their complaint seeks, inter alia, a declaratory judgment that the I & R Amendment is valid and enforceable. See Rule 57, Miss.R.Civ.P. They also ask an order compelling Secretary Molpus to place on the ballot for the next succeeding statewide general election their initiative proposing repeal of Section 98. Later, Plaintiffs caused the Circuit Court to issue a writ of certiorari to Secretary Molpus.
Secretary Molpus answered, challenging, among other things, Plaintiffs' standing to sue. More substantially, Secretary Molpus presented the final judgment in Power v. Robertson and invoked res judicata, collateral estoppel, stare decisis and related principles of finality and repose. See Rule 8(c), Miss.R.Civ.P. Secretary Molpus then moved for summary judgment, arguing that Power v. Robertson was still good law and that it rendered the Initiative and Referendum Amendment wholly unenforceable.
On June 29, 1990, the Circuit Court granted Secretary Molpus' motion and dismissed the Complaint with prejudice. Timely appeals by both parties followed.[9]

III.
Plaintiffs ask today that we overrule Power v. Robertson and thus remove the principal impediment to calling the initiative election they seek. They charge we have done so in effect through our 1988 decision in Burrell v. Mississippi State *632 Tax Commission, 536 So.2d 848, 855-58, 876-77 (Miss. 1988), and request we express what they say Burrell implies. Modesty does not attend the request.
The Circuit Court acted within the pleadings[10] and solely on grounds Power v. Robertson was controlling and dispositive of the outcome determinative legal questions. Because of this, we treat the judgment below as though the Court had dismissed the complaint for failure to state a claim upon which relief may be granted. Rule 12(b)(6), Miss.R.Civ.P.; Walton v. Bourgeois, 512 So.2d 698, 699-700 (Miss. 1987); Millican v. Turner, 503 So.2d 289, 292 (Miss. 1987).
In our present procedural posture we take as true the well-pleaded allegations of the complaint. See City of Mound Bayou v. Johnson, 562 So.2d 1212, 1213 (Miss. 1990); Petters v. Petters, 560 So.2d 722, 724-25 (Miss. 1990); Tucker v. Hinds County, 558 So.2d 869, 872 (Miss. 1990); Common Cause of Mississippi v. Smith, 548 So.2d 412, 415 (Miss. 1989); Wilkinson v. Merchantile National Bank, 529 So.2d 616, 618 (Miss. 1988).

IV.
The first issue we confront is the Plaintiffs' standing to sue. Our rules have evolved but seem settled.
Parties may sue or intervene when they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, [citations omitted], or as otherwise authorized by law [citations omitted].
Harrison County v. City of Gulfport, 557 So.2d 780, 782 (Miss. 1990). Standing is like any other charge of a party's pleading. It is subject to the rule just noted that we take as true the allegations on the face of the complaint.
There can be no serious doubt of the standing of the Attorney General, in his official capacity, to bring this action on behalf of the State of Mississippi. See, e.g., Frazier v. State ex rel. Pittman, 504 So.2d 675, 690-92 (Miss. 1987); Alexander v. State ex rel. Allain, 441 So.2d 1329, 1334 (Miss. 1983); State ex rel. Allain v. Mississippi Public Service Commission, 418 So.2d 779, 783-84 (Miss. 1982).
Reps. Vecchio and Diaz fall within our general rules of standing. They have sponsored the lottery initiative petition presented to and rejected by Secretary Molpus. As electors and taxpayers they charge that state law devolves upon the Secretary of State the duty to accept their petition, that he has refused, and that they are of right entitled to a judicial decree that he comply. Secretary Molpus' refusal of Reps. Vecchio's and Diaz's petition inflicts upon them a legally cognizable adverse effect. Beyond this, they assert a colorable interest in the subject matter of the litigation and as such have standing to sue. See Johnson v. Hinds County, 524 So.2d 947, 953-54 (Miss. 1988); Dye v. State ex rel. Hale, 507 So.2d 332, 338 (Miss. 1987); Belhaven Improvement Association, Inc. v. City of Jackson, 507 So.2d 41, 45-47 (Miss. 1987). Power itself suggests standing, albeit under our antiquated but still extant certiorari procedure. Power, 130 Miss. at 222-29, 93 So. at 772-75.

V.
In their brief and at argument, Plaintiffs have charged that fundamental rights of the people are at stake in this case. "The power of the people  embodied in the Initiative and Referendum  is the central focus and sole subject matter of this law-suit," or so we are told. Plaintiffs ground this view in the initial provisions of our Constitution's Bill of Rights, which are indeed worthy of recitation.
ARTICLE 3
BILL OF RIGHTS
Section 5. All political power is vested in, and derived from, the people; all *633 government of right originates with the people, is founded upon their will only, and is instituted solely for the good of the whole.
Section 6. The people of this state have the inherent, sole, and exclusive right to regulate the internal government and police thereof, and to alter and abolish their constitution and form of government whenever they deem it necessary to their safety and happiness; provided, such change be not repugnant to the constitution of the United States.
Miss. Const. Art. 3, §§ 5, 6 (1890).
Plaintiffs find a force in these principles they suggest compels a decision resurrecting I & R. The argument but begs the question.
If we understand them, Plaintiffs tell us that Sections 5 and 6 establish principles which channel interpretation in favor of "the power of the people." The problem with the premise is that it is equally consistent with both views of the ultimate issues in this case. Put more broadly, there is nothing in the nature of a deep allegiance to the principles of Sections 5 and 6 that would per force render one for or against initiative and referendum. A reasonable and intelligent citizen, accepting Sections 5 and 6 as her first article of political faith, may on reason reject I & R as easily as she may embrace it.
No one doubts that the people of this state are the ultimate source of all political power and, particularly, of the legislative power. In widely varying political climates and historical contexts, our people have, over the last 172 years, promulgated four constitutions. In each of these, we have opted for representative democracy, the premise that the legislative power shall be exercised by those elected by the people rather than directly by the people themselves.[11] There is nothing in the idea of representative democracy through a constituent assembly that is in the slightest way inconsistent with the powerful political principles articulated in Sections 5 and 6 of our Constitution. It is certainly true that some states supplement their constitutions' regime of representative democracy with varying doses of direct democracy through initiative and referendum processes. There was a time in our nation's history when the idea was quite popular. No one has ever suggested, however, that a state without initiative and referendum denied to its people a republican form of government, U.S. Const. Art. IV, § 4, nor until today that, for our lack of I & R, Mississippi was any less committed to the theory and practice of popular democracy.
In sum, we find in Sections 5 and 6 much impressive language but none having legal force that compels I & R.

VI.

A.
The Circuit Court accepted Secretary Molpus' affirmative defense that Plaintiffs' complaint and the issues there raised were barred by the legal interpretation, holding and final judgment of Power v. Robertson. The point packs punch. Weighty considerations of finality and repose counsel restraint in the face of sixty-eight year old precedent, even if we be convinced it was wrongly decided. In most settings the mere fact that a prior ruling may have been wrong  even badly wrong  is not enough to move the judicial hand. See Federated Department Stores, Inc. v. Moitie, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103, 109 (1981); City of Mound Bayou v. Johnson, 562 So.2d 1212, 1220 (Miss. 1990).
We act on the two levels, suggested by what we have just said: first, the precedential effect of Power's textual interpretation, and second, Power's preclusive effect upon its parties and those who have succeeded in office.

B.

1.
Power was decided almost seven decades ago. Plaintiffs say we should overrule it. *634 In fact, Power read former Section 273 restrictively, was mentioned a few months later in Miller v. State ex rel. Russell, 130 Miss. 564, 581, 94 So. 706, 707-708 (1923), and fell into disuse, the subject of but isolated note until recently[12] and Burrell. Decades of dust have settled over Power, suggesting to the legal mind that bundle of principles we collect under the label stare decisis.[13]
One stick in the bundle is that long established legal interpretations ought not lightly be disturbed. We are told of biblical origins: "Remove not the ancient landmark, which thy fathers have set," Proverbs 22:28, quoted in Wilson v. St. Regis Pulp & Paper Corporation, 240 So.2d 137, 143 (Miss. 1979) (Rodgers, J., dissenting); and of Latin expressions: "Ne movete quieta  do not disturb things that are settled," Hogatt v. Bingaman, 5 Miss. (7 Howard) 221, 222 (1843). More rationally, stare decisis proceeds from that first principle of justice, that, absent powerful countervailing considerations, like cases ought to be decided alike.[14]See Griffith v. Kentucky, 479 U.S. 314, 323-34, 107 S.Ct. 708, 713-14, 93 L.Ed.2d 649, 658-59 (1987). It draws its power from the premise that
... when a majority of the Court speaks, it speaks as the voice of the State, and is binding in effect until and unless overruled.
Childress v. State, 188 Miss. 573, 577, 195 So. 583, 584 (1940).
Justice Gillespie explained in 1955:
... The doctrine of stare decisis is the bedrock of our system of jurisprudence. It has given direction and stability to the common law whose precepts constitute the larger part of the rules by which we live and are governed. It demands definiteness in the law, and that its rules be consistent so that they may be known. It has been said to be the most fundamental characteristic of the common law as distinguished from other systems.
Laurel Daily Leader, Inc. v. James, 224 Miss. 654, 681, 80 So.2d 770, 780-81 (1955) (Gillespie, J., Special Opinion).
These imperatives obtain in public matters and constitutional interpretation, although not so strongly as in private litigation, it is commonly thought. Adams v. Yazoo & Mississippi Valley Railroad Company, 77 Miss. 194, 308, 24 So. 317, 319 (1898); see also, Glidden Company v. Zdanok, 370 U.S. 530, 543, 82 S.Ct. 1459, 1469, 8 L.Ed.2d 671, 683 (1962); Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 405-408, 52 S.Ct. 443, 446-448, 76 L.Ed. 815, 823-25 ns. 1-3 (1932) (Brandeis, J., dissenting). The reason is the obvious one, that "the ultimate touchstone of constitutionality is the Constitution itself, not what [the Justices have] said about it." Graves v. New York, 306 U.S. 466, 491-92, 59 S.Ct. 595, 604, 83 L.Ed. 927, 939 (1939). Truisms are nice and often moving, but today's case requires principled consideration of stare decisis' component parts.
Plaintiffs' challenge is an unusual one. They do not assault a prior interpretation of a constitutional text conferring rights upon citizens or empowering public officials or promoting public policy. We are concerned instead with procedural rules, albeit constitutional procedural rules. We are presented an attack upon a prior interpretation of the ground rules for amending our Constitution. The attack seeks to resurrect a second and enlarged procedural avenue  I & R  to amending the Constitution. In this setting we recall that
Constitutions stabilize society. They insulate us from the passions of the moment's majority. Yet societies grow and, *635 it is to be hoped, mature, and no constitution serves well that unreasonably inhibits that growth. An amendment process is vital if our society be vital.
Burrell, 536 So.2d at 855. We know of no serious devotee of democratic governments who has ever thought amending a constitution ought to be made impossible or easy.

2.
Today's Plaintiffs charge we should overrule Power because it wrongly read Section 273, as it existed in 1922, and en route dashed I & R. When a party attacks an established constitutional interpretation, he must per force address the level of error. Our cases are less than precise on what degree or quantum of error must be shown to move the judicial hand. Outside the constitutional context Justice Gillespie asks whether "the previous rule of law would perpetuate error?" Laurel Daily Leader, 224 Miss. at 681, 80 So.2d at 781. Our duty extends to correcting "great and glaring error." Brewer v. Browning, 115 Miss. 358, 365, 76 So. 267, 270 (1917). Power asks if the prior reading is "clearly wrong." 130 Miss. at 235, 93 So. at 777. Still, it seems settled that, without more, academic or historical demonstration of error are not enough.
Plaintiffs argue, not unpersuasively, that as an original proposition Power (mis)read into the Constitution an erroneously restrictive interpretation of Section 273. The fact that Brantley by a divided Court read Section 273 so as to uphold I & R and that five years later Power by a divided Court did the opposite suggests the possibility that  as an original proposition  the point is fairly debatable. Presiding Justice Hawkins is of the view that I & R "clearly passed the `unity of object' test" found in pre-1959 Section 273, Burrell, 536 So.2d at 877, and three other Justices joined in this view. But even if we assume Power misread the rule, and seriously so, stare decisis demands that Plaintiffs show more. Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 465 (Miss. 1983).

3.
In stare decisis generally, we look for error, but, finding that, we look for more and we look largely in the area of public or widespread disadvantage. Ordinarily, we do not overrule erroneous precedent unless it is "pernicious," Stone v. Reichman-Crosby Co., 43 So.2d 184, 190 (Miss. 1949); "impractical," Robinson v. State, 434 So.2d 206, 210 (Miss. 1983) (Hawkins, J., concurring); or is "mischievous in its effect, and resulting in detriment to the public." Childress v. State, 188 Miss. 573, 577, 195 So. 583, 584 (1940). We look for "evils attendant upon a continuation of the old rule." Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 467 (Miss. 1983).
One accepted ground for judicial overruling of a demonstrably erroneous prior constitutional interpretation is that, across the years, it has produced great and sustained harm; in Power's words, if it is "clearly ... hurtful ..." 130 Miss. at 235, 93 So. at 777. The test is an objective one, that we find over time the precedent has repeatedly had a substantial adverse or significantly harmful effect upon the people. Nationally, we think of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (overruling interpretation of Equal Protection Clause that allowed state-imposed racial segregation); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (announcing one man, one vote interpretation and overruling prior holdings of non-justiciability of "political" questions); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); (overruling interpretation of right to counsel in Sixth and Fourteenth Amendments that had allowed states to secure non-capital criminal convictions of uncounseled defendants); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (overruling sub silentio restrictive interpretation of commerce clause and restricting substantive due process). Recent forward leaps within this state include Alexander v. State ex rel. Allain, 441 So.2d 1329 (Miss. 1983) (overruling prior judicial deference to Legislature's expansive interpretation of its powers to include manning and domination *636 of key executive boards, agencies and departments); and Newell v. State, 308 So.2d 71 (Miss. 1975) and progeny (overruling prior restrictive interpretation of judicial power in face of great public inconvenience caused by archaic rules of practice and procedure in state courts).
By way of contrast, there is naught before us suggesting Power's effects have been adverse or harmful on anything like the broad scale of these familiar cases. Adversarial rhetoric aside, we find no seriously pressed suggestion that Power perpetuates a specific adverse or harmful effect beyond that of preventing an immediate direct popular referendum on whether Mississippi should have a lottery. We are cited not a single additional occasion on which Power and its reading of (now amended) Section 273 in their sixty-nine year life are said to have thwarted the public weal. In conventional overruling assaults, the proponents present casualties as they attack the major premise of the prior interpretation, e.g., that state-imposed racial segregation is a monstrous moral evil, that legislative domination of policies and procedures in the executive and judicial branches of this state produces great and systemic public inconvenience, etc. They show a substantial causal link between the said-to-have-been-erroneous interpretation and widespread and repeated public harm. Here we are afforded no clue, beyond lottery,[15] what specific end may be desired, what specific evil may be avoided via rereading old Section 273 and through I & R's resurrection.
If Power's restrictive reading of Section 273 had, in effect, rendered it impossible to amend our Constitution, and if this judicially imposed stranglehold on the amendment process had locked our state into a constitution which demonstrably thwarted our growth and progress, this Court would likely be moved to act. We have no such record before us. Power has certainly not prevented the people of this state from amending their Constitution, particularly since the 1959 amendment to Section 273. Of the 101 amendments made to the Constitution since 1890, some sixty-three have been ratified since 1959.
Today's proponents fail the temporal test as well. We are given no list of occasions over the years when lack of I & R thwarted the public's desire and need for political relief. More importantly, Plaintiffs have presented nothing suggesting a likely permanence in the inconvenience they perceive. In a case such as today's, it is not unreasonable to suggest that the proponents bear the burden of producing evidence that Power has produced a more lasting level of public inconvenience, that it and the lack of a viable amendment process, augmented by I & R, have been the direct and proximate frustration of the public will and weal on broad and diverse fronts over the years. Instead we are fed but lottery, today, and rhetoric.
To be sure, one of the reasons traditionally proffered for relaxing stare decisis in constitutional interpretation has been the practical difficulty of amending a constitution,[16] but we have experienced no such difficulties. All that is before us is the fact that in two consecutive sessions the Legislature has refused to submit to the electorate an amendment to repeal Section 98's lottery ban. That over the years this political constituency or that's pet amendment has failed hardly shows the inefficacy of the amendment process. It may show its vitality. Over the past century, more than a hundred amendments have been made to our Constitution. Assuming arguendo the demonstrable desirability of repealing Section 98, it seems more consonant with respect for our democratic institutions that the people be given a chance to pass judgment on those said-to-be-recalcitrant legislators before we seriously consider the judicial end run.

*637 4.
There is a further dimension. Proponents may have demonstrated the legal error in past interpretation, and may have added a showing of substantial and continuing harm from that past interpretation. This opens the door. We may accept that a prior interpretation is "clearly wrong and hurtful," Power, 130 Miss. at 235, 93 So. at 777, but this but begs the question whether the new interpretation Plaintiffs proffer should be accepted.
Suffice it to say that when we embark upon new interpretation we must divine that interpretation which best fits the constitutional text and which flows from the best justification that may be given for the continued inclusion of that text in the Constitution. Knight v. State ex rel. Moore, 574 So.2d 662, 667 (not yet reported); Burrell v. Mississippi State Tax Commission, 536 So.2d at 854-55; Alexander v. State ex rel. Allain, 441 So.2d at 1332-33. We pretermit this search today in view of the result we reach.

5.
Plaintiffs argue for a relaxed view of stare decisis on another score. Their premise is that "only the proper administration of the government ... [is] involved" today, citing Beck v. Allen, 58 Miss. 143, 173 (1880), and were that so, the argument would have force. In a variety of contexts where parties have sought the overruling of said-to-be-erroneous judicial doctrine, we have given much thought to the reliance factor and whether there be persons whose legitimate expectations may be dashed by our action. See, e.g., Tideway Oil Programs, Inc. v. Serio, 431 So.2d at 465-66. We have a somewhat freer hand where vested rights or good faith expectations are not at risk.
These views encounter another policy stare decisis' bundle embodies. Our people have a need to have their law settled so that they might rely upon it. Where litigants challenge a prior ruling, upon which persons may justifiably have placed their faith, we consider that a weighty factor. See, e.g., Tideway Oil Programs, Inc., 431 So.2d at 465; New York Life Insurance Co. v. Bolling, 177 Miss. 172, 187, 169 So. 882, 883 (1936). This is so even in the realm of constitutional interpretation. Collier v. Shell Oil Co., 534 So.2d 1015, 1017-19 (Miss. 1988).
We find more involved here than "the [mere] proper administration of the government." The reliance interest is less precise than is often the case in purely private litigation, but it is present. Much is said of the I & R thresholds  7,500 people in the case of an initiative and 6,000 in the case of a referendum  which would allow a tiny fraction of the state's people to place issues on the ballot. In 1914 approximately fifteen to eighteen percent of those appearing at the polls in a statewide election would have been required to sign an initiative petition to achieve the 7,500 threshold. Today, 7,500 signatures represent a negligible fraction of our voters, approximately one percent of the 721,965 votes case in the 1987 statewide election, and 0.8 percent of the 934,527 votes cast in the 1988 statewide election. I & R's 7,500 and 6,000 signature thresholds had one meaning in 1914 when proposed; they have a markedly different significance today.
We are told that these minimums are lower than that in any other state in the Union. Properly speaking, the judiciary has no concern with where these thresholds may have been set, but in the exercise of our duty to respect reliance interests, we put our heads in the sand if we do not realize that I & R states have, over the years, increased their signature minimums from those initially adopted so that many now have percentage thresholds which would require a much larger number of the state's qualified electors than required by the I & R Plaintiffs would revisit upon us.[17] *638 The practical reality is that, for almost sixty-nine years, those in this state who may have been interested in the subject  both in the Legislature and amongst the people  have had no occasion to think of the matter. There was every reason to believe Mississippi was not an I & R state. Judging from the experience in other I & R states, we regard it quite likely that, had Power never been decided and had Brantley remained the law, over the years the legislature and our people would have amended I & R to increase the thresholds. It is reasonable to assume that they did not do this in reliance upon the permanence of Power.
The point acquires its potency when we realize that the effect of overruling Power would not merely clear the way for the Legislature to propose a new I & R Amendment which could be submitted to the people and not encounter the hurdles of Power. An overruling of Power would, without question, resurrect I & R as though Brantley had always been the law and Power had never been decided. I & R would spring back to life and become once more an organic part of the Constitution, enforceable immediately. See State v. Douglas, 278 So.2d 485, 490-92 (La. 1973); Jawish v. Morlet, 86 A.2d 96, 97 (D.C. 1952); State ex rel. Badgett v. Lee, 156 Fla. 291, 294-95, 22 So.2d 804, 806 (1945); Christopher v. Mungen, 61 Fla. 513, 532-33, 55 So. 273, 280 (1911); Pierce v. Pierce, 46 Ind. 86, 95 (1874); McCollum v. McConaughy, 141 Iowa 172, 177, 119 N.W. 539, 541 (1909).
If anything is without controversy in this case, it is that the Legislature and the people know how to amend their Constitution. Over a hundred amendments have been made and enacted since 1890, as we have seen. If the people want I & R in Mississippi, their course is clear. For present purposes, the counsel of prudence is that we allow the process to work.

6.
Constitutional stare decisis bears a separate dimension. It addresses the legitimacy of process more than immediate results or specific interpretations, about which judges inevitably will differ. At stake is public confidence in our disinterestedness. Expositions of the Constitution should be grounded in law and not the proclivities of individuals, nor the politics of the moment. Legal interpretation does and should change with the times and the frequent agent of that change is a change in judicial personnel, but it is accepted that public confidence in the law requires substantial stability in the face of such changes. We must be careful lest our interpretations reflect the idiosyncratic views of judges rather than the shared and enduring values of the people embodied in the Constitution we are sworn to serve.
It is with good reason that people cling to the idea that their cases should be decided the same no matter who the judge may be. Popular and professional confidence in the judiciary rests on the impersonality of decisions and their reasoned foundation, which in turn are built upon the respect accorded them by successor justices and by their staying power. Among the "weighty considerations" supporting adherence to precedent, the late Justice Harlan listed prominently "the necessity of maintaining reasoned judgments." Moragne v. States Marine Lines, 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339, 358 (1970).
Deference to these concerns nourishes the legitimacy of judicial review, which, though grounded in law and history, Alexander v. State ex rel. Allain, 441 So.2d 1329, 1333 (Miss. 1983); Runnels v. State, Walker (1 Miss.) 146 (1823), over time draws its life and force from public acceptance. Principled consistency and respect for precedent promote acceptance. They reflect a consensus about law. They contribute to the notion that law binds judges as well as litigants, and not just when we *639 agree. Good judges know this and will change legal interpretations only for the most persuasive reasons.
The early history of the I & R Amendment demonstrates less than fidelity to these principles. Ordinarily, one would have thought the Court in Power bound by the precedent of Brantley. The argument can be and has certainly been made that the shift from Brantley to Power was more a product of politics than law. A return to Brantley would leave today's Court open to the same charge, and we would find it difficult to avoid conviction. If we were to overrule Power and resurrect Brantley and I & R, what is to prevent this Court  five years down the road  and in the case of further changes in personnel  from reversing itself again? For better or for worse, the politics of I & R, within the judicial department of this state's government, came to an end in 1922.

7.
There is another reason why we should reject Plaintiffs' claim. Power is an interpretation of Section 273 as it existed prior to 1959. Courts do not normally overrule readings of statutes which have been amended. The obvious reason is that the amendment itself overrules the prior interpretation, which becomes for all practical purposes relegated to history. There is no reason why the same principle should not apply to a provision of the Constitution such as Section 273.
The fact of the business is that, since 1959, we have had no occasion to interpret Section 273 in the manner and form in which it existed in 1922, and it seems a safe bet we never will again  unless, of course, the people should amend Section 273 to return to its prior language  an event we deem quite unlikely, but if it should happen, there will then be time enough to consider an overruling of Power. For the moment, we are merely asked to do that which the legislature and the people did in 1959.[18]
All of this unmasks the essence of Plaintiffs' claim. As strenuously as they urge that we overrule Power, that would be but a means to an end. Power's reading of pre-1959 Section 273 is not what Plaintiffs find offensive. Indeed, the Power constriction of the ground rules for amending our Constitution could not offend today's Plaintiffs or anyone else, because in 1959 it ceased to exist. Plaintiffs object to Power's application of then Section 273 and to Power's holding that I & R did not pass muster. So seen, Plaintiffs' suit brings us face to face with the preclusive effect vel non this Court's final judgment in Power should enjoy, a matter to which we now turn.

C.

1.
Secretary Molpus pleaded below and argues here that the present action is precluded by the rule we label res judicata. Premised on the bundle of principles articulated in Part B above and on the policy imperative that there must be an end to litigation, Williams v. Board of Supervisors *640 of DeSoto County, 139 Miss. 78, 86, 103 So. 812 (1925), our law has long accepted that a final judgment on the merits bars, as between the parties or those in privity with them, further claims arising out of the same subject matter. Res judicata has evolved a series of requisites to its restrictive effect, and, if these be met, the final judgment bars not only those claims asserted but also those that may have been brought. See, e.g., Bowe v. Bowe, 557 So.2d 793, 794 (Miss. 1990); DeFoe v. Great Southern National Bank, N.A., 547 So.2d 786, 788 (Miss. 1989); Riley v. Moreland, 537 So.2d 1348, 1354 (Miss. 1989).
Before a final judgment in one action may bar a later action, there must have been an identity of claims and subject matter between the two. These identities are lacking today. In Power, Revenue Agent Robertson sued for an injunction that the initiative regarding his pay not be placed on the ballot. Secretary of State Power resisted on grounds a proper petition had been presented to him and that state law imposed upon him the official duty to submit the initiative to the electorate. Today's Plaintiffs claim entitlement that a wholly different initiative be submitted to the people, one that would repeal the Constitution's ban on lotteries. Today's lottery claim was not brought in Power, nor could it have been, because, if for no other reason, no petition calling for such an initiative had been presented to the Secretary of State or otherwise made a part of the record.

2.
Res judicata is a rule of claim preclusion. It has a sister doctrine, a somewhat less formalistic rule of issue preclusion, a rule we have denominated collateral estoppel. Of late there has been a certain ferment around the penumbra of collateral estoppel, see, e.g., Jordan v. McKenna, 573 So.2d 1371 (Miss. 1990); McCoy v. Colonial Baking Co., 572 So.2d 850 (Miss. 1990). At its core, the rule precludes parties from relitigating issues authoritatively decided on their merits in prior litigation to which they were parties or in privity. Collateral estoppel seems a closer fit, for today's Plaintiffs unabashedly demand a day in court to litigate the validity and enforceability of the I & R Amendment as measured against former Section 273. This precise issue was before the Court in Power and was there fully and finally adjudged. Today's Plaintiffs are successors in office or have sufficient identity with the Power parties that collateral estoppel should bar them.
Several would-be escape routes quickly close upon examination. Collateral estoppel is more commonly invoked to preclude relitigation of fact issues, rendering it a sort of rule of evidence, if you will. The Section 273/I & R issue presents a point of law. No matter. Collateral estoppel precludes revisiting issues previously decided, and nothing in the rule limits its coverage to issues of fact. See Montana v. United States, 440 U.S. 147, 162-63, 99 S.Ct. 970, 978, 59 L.Ed.2d 210, 222-23 (1979). The rule precludes relitigation of issues of constitutional law, Love v. Mayor & Board of Aldermen of Yazoo City, 162 Miss. 65, 138 So. 600, 603 (1932), and we have used it to deliver the damned to the darkness of death. Evans v. State, 485 So.2d 276, 277 (Miss. 1986); see also, Neal v. State, 525 So.2d 1279, 1283-84 (Miss. 1987).
Nor does the fact that this is not purely private civil litigation change things. If the rule's requisites are otherwise met, collateral estoppel (and res judicata, as well) cover(s) issues litigated by the state, its political subdivisions, and the officers of each in their official capacities. Pan American Petroleum Corp. v. Gully, 179 Miss. 847, 863, 175 So. 185, 189 (1937).

3.
A final decision of an issue on its merits is normally thought preclusive only if there is an identity of parties from one suit to the next, and of their capacities as well. Privity, succession in interest, and relationship are terms used to express these identities. See Jordan v. McKenna, 573 So.2d at 1374-77; McCoy v. Colonial Baking Co., 572 So.2d at 853; Walton v. Bourgeois, 512 So.2d 698, 701 (Miss. 1987); *641 Restatement (Second) of Judgments § 14 (1977).
The Secretary of State is a party to both suits. Joseph W. Power, Secretary of State, was the original Defendant in the 1922 case. Dick Molpus, of course, is the Defendant here. The position argued by the Secretary of State, however, has changed. In Power the Secretary of State argued that the Initiative and Referendum Amendment was valid and enforceable. In this case, Power's force compels Secretary Molpus to the opposite position.
The State of Mississippi through its Attorney General is a party in both cases. In Power, the Attorney General filed a separate brief urging that the complaint be dismissed and that the Initiative and Referendum Amendment be considered a valid and enforceable part of the Constitution. See Power, 130 Miss. at 190-198, 93 So. 769. The Official Reporter reflects that H. Cassedy Holden, Assistant Attorney General, appeared "for the state." The brief Asst. Atty. Gen. Holden filed is entitled "Brief for the State." It appears that Secretary of State Power engaged separate counsel, for there follows in the Official Reporter a summary of "Brief for Appellants." 130 Miss. at 198-200, 93 So. 769. In today's case, of course, the State appears as a party through Attorney General Michael C. Moore, who argues the same end view his predecessor in office sought on the State's behalf back in 1922.
A judgment against a public official in his official capacity is ordinarily binding on the government he serves and its political subdivisions. Pan American Petroleum Corp. v. Gully, 179 Miss. 847, 863, 175 So. 185, 189 (1937) (collecting cases); accord, Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402-03, 60 S.Ct. 907, 917, 84 L.Ed. 1263, 1276 (1940). Such a judgment is similarly binding on the public official's successors in office. Finch v. Dobbs, 112 Miss. 73, 75-76, 72 So. 858, 859 (1916) (decree against state land commissioner binding against his successor in office); see City of New Orleans v. Citizens' Bank of Louisiana, 167 U.S. 371, 388-89, 17 S.Ct. 905, 911-912, 42 L.Ed. 202, 208 (1897). In public interest lawsuits brought against a public official or governing body to test the validity of a law, the law provides that all citizens and taxpayers are considered parties in interest to, and are bound by, the proceedings. City of West Point v. Hawkins, 164 Miss. 591, 596-97, 145 So. 345, 346 (1933); Love v. Mayor & Board of Aldermen of Yazoo City, 162 Miss. 65, 77, 138 So. 600, 603 (1932); Bank of Commerce & Trust Co. v. Commissioners of Tallahatchie Drainage Dist. No. 1, 157 Miss. 336, 343, 128 So. 91, 92 (1930); Von Zondt v. Town of Braxton, 149 Miss. 461, 464-65, 115 So. 557, 559 (1928); Williams v. Board of Supervisors of DeSoto County, 139 Miss. 78, 86, 103 So. 812, 812-13 (1925); see Cox v. Jackson Municipal Separate School District, 503 So.2d 265, 268 (Miss. 1987). Attorney General Moore proceeds on behalf of the same government and public bound by Power's final judgment.

4.
Still Power may be thought embarrassed in any claim to preclude today's central issue. One would have thought Brantley's 1917 decision precluded Power revisiting the point but five years later. We are told, however, that in Power no one pleaded collateral estoppel,[19] and we accept that then as now such matters are in the nature of affirmative defenses which are waived if not timely pleaded. See Rule 8(c), Miss.R.Civ.P. Beyond this, when inconsistent final judgments are rendered in two actions, the judgment more recent in time is given conclusive effect in a later action. Dimock v. Revere Copper Co., 117 *642 U.S. 559, 566, 6 S.Ct. 855, 857-58, 29 L.Ed. 994, 997 (1886); Reimer v. Smith, 663 F.2d 1316, 1327 (5th Cir.1981); Garden Suburbs Golf & Country Club, Inc. v. Murrell, 180 F.2d 435, 436 (5th Cir.1950); Donald v. J.J. White Lumber Co., 68 F.2d 441, 442 (5th Cir.1934); see Marsh v. Mandeville, 28 Miss. 122, 128 (1854); Restatement (Second) of Judgments § 15 (1977); 2 E. Tuttle, Freeman On Judgments § 629 (5th ed. 1925). Since Power was decided more recently than Brantley, the judgment in Power bars the Section 273/I & R issue Plaintiffs seek to relitigate.
The public interest in stability and repose is so paramount that collateral estoppel protects competent judgments which are subsequently thought to be erroneous. Where the elements of estoppel have been satisfied, the court's inquiry is not "whether the court's order was erroneous, but only that it was the final judgment of the case." Aetna Casualty & Surety Co. v. Espinosa, 469 So.2d 64, 67 (Miss. 1985) (collecting cases). Our law rebuffs subsequent attempts to impeach or attack the initial judgment even where, for example, (a) additional evidence has been discovered, Cotton v. Walker, 164 Miss. 208, 224-25, 144 So. 45, 47 (1932); (b) the substantive law was incorrectly decided and applied, Fisher v. Browning, 107 Miss. 729, 739, 66 So. 132, 136 (1914); or, as noted above, (c) where constitutional questions have been erroneously decided, Love v. Mayor & Board of Aldermen of Yazoo City, 162 Miss. at 77, 138 So. at 601.
To be sure, collateral estoppel and its cousin, res judicata, are not inflexible commands which must be brutally enforced in all cases. Mississippi Employment Security Commission v. Philadelphia Municipal Separate School District, 437 So.2d 388, 397 (Miss. 1983); Garraway v. Retail Credit Company, 244 Miss. 376, 386, 141 So.2d 727, 730 (1962); Brewer v. Browning, 115 Miss. 358, 364-65, 76 So. 267, 269-70 (1917). They are rules which exalt the public concerns in finality and repose in litigation, but there are times when those concerns are not paramount. Among those times are those when lawfully-declared public policy would be seriously compromised. Bronson v. Board of Education, Etc., 525 F.2d 344, 349 (6th Cir.1975); Tipler v. E.I. duPont deNemours and Co., 443 F.2d 125, 128 (6th Cir.1971). There is power in what Chief Justice Patterson wrote in Bragg v. Carter, 367 So.2d 165, 167 (Miss. 1978): "[T]he doctrine of res judicata must yield to the Constitution." And the same of collateral estoppel. Cf. Bogard v. Cook, 586 F.2d 399, 408 (5th Cir.1978). But even in cases such as these, plaintiffs have a high hill to climb. Today's Plaintiffs stumble on the rocks of public harm, reliance, stability, and integrity of process and fall far short of the peak.

5.
Plaintiffs argue that the Power judgment should not preclude the present issues on grounds there has been a change in the law since 1922. The point is the rather imaginative assertion that Burrell v. Mississippi State Tax Commission, 536 So.2d 848 (Miss. 1988), overrules the Power interpretation of Section 273, the section of the Constitution prescribing the ground rules for making amendments. This assertion is bootstrapped onto the presumption of retroactivity normally thought attending judicial overruling of prior precedent, a familiar fiction that the rule or interpretation the later Court announces is not new law but was, and always has been, the law. Griffin v. Illinois, 351 U.S. 12, 25-26, 76 S.Ct. 585, 593-94, 100 L.Ed. 891, 902 (1956) (Frankfurter, J., concurring); Collier v. Shell Oil Company, 534 So.2d 1015, 1018 (Miss. 1988). The premises do not apply here, and the reason is that Power's version of Section 273 was substantially amended in 1959. Burrell addressed the meaning of post-1959 Section 273. Power was decided under pre-1959 Section 273. These are different questions of legal interpretation.
The matter of the 1922 meaning of Section 273 was not a question before the Court in Burrell. It was not a question that was or could have been before the Court in Burrell. The controlling opinion in Burrell did note the inconsistency between Brantley and Power, but made nothing *643 of the point. Burrell, 536 So.2d at 855. It is true Burrell recited the reasoning of several pre-1959 cases to aid its search for the meaning of post-1959 Section 273, but this does not change the law as it existed when Power was decided in 1922.
Burrell did not change the Power law, but the 1959 amendment to Section 273 certainly did, and it is a fair question whether that change should occasion an overruling  with retroactive effect  of Power's handling of the Section 273/I & R issue. We have addressed variants of the question in other contexts. On policy grounds, a citizen who offends a law later repealed may not be held, but this is so only where the state has not otherwise acquired vested rights. See State ex rel. Pittman v. Ladner, 512 So.2d 1271, 1274-75 (Miss. 1987). This premise presumes as well that the matter has not been finally adjudged. See Stone v. Independent Linen Service Co., 212 Miss. 580, 586-87, 55 So.2d 165, 168 (1951). We would think it bizarre that a change of law such as we have here works to reopen final judgments  sixty-nine years after the fact.
Constitutional amendments and statutory enactments have prospective force only, "unless a contrary intention is manifested by the clearest and most positive expression." Mladinich v. Kohn, 186 So.2d 481, 484 (Miss. 1986), (quoted with approval and followed in Flour Corp. v. Cook, 551 So.2d 897, 902 (Miss. 1989); and Cole v. National Life Ins. Co., 549 So.2d 1301, 1305 (Miss. 1989)). We take it an article of faith and law that ex post facto laws are bad practice. We rarely enact them, and not only because of constitutional bars. We accept that prevailing ex post facto jurisprudence would not have barred the Legislature and the people from having made their 1959 amendment to Section 273 retroactive, had they thought of the matter. 16A C.J.S. Constitutional Law § 409 (1984); cf. Jackson v. State, 551 So.2d 132, 140-41 (Miss. 1989). The point for the moment is that there is no language in the 1959 amendment giving it any retroactive effect. There being no such language in the amendment, we have no authority to wish it there.

6.
In Jordan v. McKenna, 573 So.2d 1371 (Miss. 1990), we held that, before we would enforce collateral estoppel against a litigant, we should find that he had adequate incentive to litigate in the first case. Where a party is bound by reason of his relationship with a prior party, a similar requirement obtains, that is, it is incumbent that we find that the State of Mississippi, through its Attorney General, had adequate incentive to resist the attack on the I & R Amendment mounted by Revenue Agent Robertson in 1922.
The point need not detain us. At that moment in time in 1922, the I & R Amendment had been inserted into the Constitution and had been upheld in Brantley. The Attorney General had not only the incentive but the sworn duty to defend the Constitution. The fact that he may not have raised certain defenses we would think important today does not undercut the point. There is nothing before us to suggest that we should alter our normal presumption that a public officer, in this instance the Attorney General of the State of Mississippi, did his duty and forcefully defended the Constitution as it then stood. See, e.g., Harris v. Harrison County Board of Supervisors, 366 So.2d 651, 655-56 (Miss. 1979); Raper v. State, 317 So.2d 709, 712-13 (Miss. 1975); State v. Stockett, 249 So.2d 388, 393 (Miss. 1971).

7.
In the end, we hold that the rule of collateral estoppel, faithfully applied to this case, precludes relitigation of the central issue Attorney General Moore wishes to present on behalf of the State of Mississippi, viz., whether the I & R Amendment was proposed and ratified and made a part of the Constitution consistent with the pre-1959 provisions of Section 273. Power v. Robertson yielded a final judgment on that issue on October 23, 1922. That judgment has enjoyed repose and remained undisturbed for close to sixty-nine years. That *644 final judgment precludes the State of Mississippi in its political and corporate capacity from relitigating the Section 273/I & R issue. The judgment precludes as well Reps. Vecchio and Diaz, as they are but citizens and officials of this same body politic.

VII.
Many other reasons are offered why we should reject Plaintiffs' claim. We are told on a variety of grounds that I & R is a poor, even dangerous, form of law making. These policy arguments seem peculiarly out of place within the judicial process. There is one consideration, however, which does give pause.
The Constitution of 1890 is valid and enforceable, and no doubt there are amendments that were made in the early years which are equally valid and enforceable. But when we are confronted with the argument that Power was an outrageous and politically motivated thwarting of the popular will, we do not think it inappropriate to note the state of the electorate in 1914, the year I & R was presented to the voters. It is a sad page of history that in 1914 the women[20] of this state were directly disenfranchised and black persons,[21] male or female, were for all practical purposes without the right to vote. In this latter context we find somewhat odd Plaintiffs' argument that the Power decision was itself motivated by racist considerations. The point for the moment is that the black people and women of this state have never had a say in whether Mississippi will be an I & R state. They should.

VIII.
The judgment of the Circuit Court of the First Judicial District of Hinds County is affirmed. By reason of this decision, the cross-appeal of Secretary Molpus is moot and dismissed as such.
ON DIRECT APPEAL, AFFIRMED; ON CROSS-APPEAL, DISMISSED AS MOOT.
DAN M. LEE, P.J., PRATHER, SULLIVAN and PITTMAN, JJ., concur.
ROY NOBLE LEE, C.J., concurs with separate written opinion.
HAWKINS, P.J., BANKS, J., not participating.
McRAE, J., not participating according to Supreme Court International Rules.
ROY NOBLE LEE, Chief Justice, concurring:
I concur that the lower court be affirmed on direct appeal and that the cross-appeal be dismissed. However, I do not agree with many of the observations and statements and much of the dicta contained in the majority opinion.
Enough said.
NOTES
[1] For an account of the passage of the proposed amendment as found in the 1914 House and Senate Journals, see:

A. MISS.HOUSE JOURNAL 276-77 (introduced and referred to Committee on Constitution), 774-75 (reported unfavorably by Committee on Constitution), 1028 (made a special order for consideration), 1131-32 (passed first reading), 1200 (passed second reading), 1227-28 (passed third reading and adopted by the House), 1254 (reported by Committee on Engrossed Bills), 1523-24 (reported as having passed the Senate), 1661-63 (reported by Committee on Enrolled Bills and signed by Speaker of the House) (1914).
B. MISS.SENATE JOURNAL 997 (reported as having passed the House), 1000-01 (referred to Committee on Constitution), 1062 (reported favorably by Committee on Constitution), 1128-29 (passed first reading), 1184 (passed second reading), 1208 (passed third reading and adopted by Senate), 1217-18 (reported to the House), 1369-72 (reported by Committee on Enrolled Bills and signed by President of the Senate) (1914).
[2] The Legislature had also adopted eight other proposed constitutional amendments to be considered at the November 3, 1914, general election. Miss. Laws, Chs. 514-22 (1914).
[3] As it read in 1914, Miss. Const. Art. 15, § 273 provided:

SECTION 273. Whenever two-thirds of each house of the legislature shall deem any change, alteration or amendment necessary to this Constitution, such proposed amendment, change or alteration shall be read and passed by two-thirds vote of each house, respectively on each day, for three several days; public notice shall then be given by the secretary of state at least three months preceding an election, at which the qualified electors shall vote directly for or against such change, alteration or amendment, and if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately; and if it shall appear that a majority of the qualified electors voting shall have voted for the proposed change, alteration or amendment, then it shall be inserted at the next succeeding session of the legislature as a part of the Constitution and not otherwise.
[4] For an account of the passage of Senate Concurrent Resolution No. 18 in the 1916 House and Senate Journals, see:

(1) MISS.SENATE JOURNAL 390 (introduced and tabled), 967-968 (reported favorably by Committee of the Whole and passed), 975 (tabled motion to reconsider), 1500-1501 (reported from House as requiring a conference), 1599 (concurred in House amendments), 1665 (reported by Committee on Engrossed Bills), 1677 (reported by Committee on Enrolled Bills and signed) (1916).
(2) MISS.HOUSE JOURNAL 1338 (received message of Senate's passage), 1459 (reported favorably by Committee on Constitution), 1920-21 (amended and passed), 1928-29 (reported by Committee on Engrossed Bills), 2075 (received message of Senate's concurrence in amendments to resolution); 2185-86 (reported by Committee on Enrolled Bills and signed) (1916).
[5] In its entirety, Section 33 of the Constitution  vintage 1917  reads as follows:

ARTICLE 4 LEGISLATIVE DEPARTMENT
SECTION 33. The legislative authority of the state shall be vested in a legislature which shall consist of a senate and a house of representatives, but the people reserve to themselves the power to propose legislative measures, laws, resolutions and amendments to the constitution, and to enact or reject the same at the polls independent of the legislature; and also reserve the power, at their own option, to approve or reject at the polls any act, item, section or any part of any act or measure passed by the legislature.
1. The first power reserved by the people is the initiative, and not more than seven thousand five hundred (7,500) qualified electors shall be required to propose any measure by initiative petition, and every such petition shall include the full text of the measure so proposed. Initiative petitions shall be filed with the secretary of state not less than three months before the election at which they are to be voted upon.
2. The second power reserved by the people is the referendum, and it may be ordered either by a petition signed by the required number of qualified voters or by the legislature, as other bills are enacted. Not more than six thousand (6,000) qualified voters may be required to sign and make valid referendum petition. The filing of a referendum petition against one or more items, sections or parts of any measure shall not delay the remainder from becoming operative. Referendum petitions against measures passed by the legislature shall be filed with the secretary of state not later than ninety (90) days after the final adjournment of the session of the legislature at which such measures were passed, except when adjournment shall be taken temporarily for a longer period than ninety (90) days, in which case such petition shall be filed not later than ninety (90) days after such temporary adjournment. All measures referred to a vote of the people by referendum petitions shall remain in abeyance until such vote is taken.
3. If it shall be necessary, for the immediate preservation of the public peace, health or safety, then a measure shall become effective without delay; such necessity shall be stated in one section, and if, upon a yea and nay vote, three-fourths of those voting in each house shall vote in favor of the measure going into immediate operation, such measure shall become operative at once. It shall be necessary to state in such section the facts constituting such emergency: Provided, that an emergency shall not be declared on any franchise or special privilege or act creating any vested right or interest, or alienating any property of the state. If a referendum petition is filed against such emergency measure, such measure shall be a law until it is voted upon by the people, and if it is then rejected by a majority of the voters voting thereon, it shall be thereby repealed.
4. The word "measure" as used herein means any law, bill, resolution, constitutional amendment, or any other legislative measure. All elections on general, local and special measures referred to the people of the state shall be held at the general state or congressional elections, except when the legislature shall order a special election. Any measure submitted to the people, as herein provided, shall take effect and become law when approved by a majority of the votes cast thereon, and not otherwise. Such measure shall be in operation on and after the thirtieth day after the election at which it is approved. The veto power of the governor shall not extend to measures initiated by or referred to the people. If conflicting measures submitted to the people shall be approved by a majority of the votes severally cast for and against the same, the one having the highest number of affirmative votes shall thereby become law. No measure enacted by a vote of the people shall be amended or repealed by the legislature except by yea and nay votes, upon roll call, of three-fourths of the members of each house voting thereon. Qualified electors only shall be counted upon petitions. Petitions may be circulated and presented in parts, but each part of any petition shall have attached thereto the affidavit of the person circulating the same, that all the signatures thereon were made in the presence of the affiant and that to the best of affiant's knowledge and belief each signature is genuine, and that the person signing is a qualified elector, and no other affidavit or verification shall be required. The sufficiency of all petitions shall be decided by the secrettry [sic] of state. In the event that the sufficiency of the petition is challenged, the question shall be tried at once, in term time or in vacation, and such cause shall be a preference cause over all other causes. If the secretary of state shall decide any petition to be insufficient, he shall, without delay, notify the sponsors of the petition and permit at least thirty (30) days for correction or amendment. In the event of legal proceedings in any court to prevent giving effect to any petition upon any grounds, the burden of proof shall be upon the person or persons attacking the validity of the petition. This section shall not be construed to deprive any member of the legislature of the right to introduce any bill. The style of all bills initiated by petition shall be: "Be it enacted by the people of the state of Mississippi." In submitting the measures, the secretary of state and all other officials shall be guided by the general election laws until additional legislation may be provided therefor, but no legislation shall be enacted to impair or hamper the exercise of the rights herein reserved to the people.
Adopted by the senate March 10, 1916.
Adopted by the house of representatives March 29, 1916.
(In effect March 29, 1916.)
[6] From 1890 until 1959, Section 273 in its entirety read as follows:

AMENDMENTS TO THE CONSTITUTION
Section 273. Whenever two-thirds of each house of the legislature shall deem any change, alteration or amendment necessary to this Constitution, such proposed amendment, change or alteration shall be read and passed by two-thirds vote of each house, respectively on each day, for three several days; public notice shall then be given by the secretary of state at least three months preceding an election, at which the qualified electors shall vote directly for or against such change, alteration or amendment, and if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately; and if it shall appear that a majority of the qualified electors voting shall have voted for the proposed change, alteration or amendment, then it shall be inserted at the next succeeding session of the legislature as a part of the Constitution and not otherwise.
In 1959 the people substantially amended Section 273. See Miss. Laws, Ch. 629 (1958), and Miss. Laws, Ch. 78 (1959) and fn. 18 infra.
[7] Miss. Const. Art. 4, § 98 (1890) reads:

Section 98. No lottery shall ever be allowed, or be advertised by newspapers, or otherwise, or its tickets be sold in this state; and the legislature shall provide by law for the enforcement of this provision; nor shall any lottery heretofore authorized be permitted to be drawn or its tickets sold.
See Knight v. State ex rel. Moore, 574 So.2d 662 (Miss. 1990).
[8] The petitions were presented in the following form:

 INITIATIVE PETITION PROPOSING TO REPEAL SECTION 98 OF THE MISSISSIPPI
 CONSTITUTION OF 1890, WHICH PROHIBITS LOTTERIES IN THIS STATE
 TO THE SECRETARY OF STATE OF THE STATE OF MISSISSIPPI, JACKSON,
 MISSISSIPPI:
 Pursuant to Section 33 of the Mississippi Constitution of 1890, as
 proposed for amendment by Chapter 520, Laws of 1914, which proposed
 amendment the Mississippi Legislature subsequently declared by Chapter
 159, Laws of 1916, to have been passed and approved at the polls by the
 people of this state in a general state election duly held throughout
 Mississippi on November 3, 1914, we, the undersigned, being qualified
 electors of the State of Mississippi, in the exercise of the power
 reserved by the people under the Constitution of this state, do hereby
 submit this initiative petition proposing to amend the Mississippi
 Constitution of 1890, by repealing Section 98, which prohibits lotteries
 in this state; and do further request that the following measure be
 presented to the electors for their approval or rejection at the November
 6, 1990 general election or, if the Secretary of State shall fail or
 refuse to present this measure at such election, then we request this
 measure be presented to the electors at the next state general election
 or congressional elections held at least three (3) months after a court
 of competent jurisdiction directs the Secretary of State to hold an
 election on this measure:
 BE IT ENACTED BY THE PEOPLE OF THE STATE OF MISSISSIPPI:
 Amend the Mississippi Constitution of 1890, by repealing Section 98 which
 reads as follows:
 Section 98. No lottery shall ever be allowed, or be advertised by
 newspapers, or otherwise, or its tickets be sold in this state; and the
 Legislature shall provide by law for the enforcement of this provision;
 nor shall any lottery heretofore authorized be permitted to be drawn or
 its tickets sold.
Signature: Signature:
__________________________________ _________________________________
(As appears on pollbook) (As appears on pollbook)
Name: Name:
__________________________________ _________________________________
(Print) (Print)
Legal Residence: Legal Residence:
__________________________________ _________________________________
(Street or road name and (Street or road name and
number) number)
__________________________________ _________________________________
(City) (County) (City) (County)

[9] In view of the disposition we make, we have no occasion to address Secretary Molpus' cross-appeal, which becomes moot.
[10] Before the Circuit Court each side had submitted affidavits in support of or in opposition to the motion, respectively. See Rule 56(a) and (f), Miss.R.Civ.P. The Court struck all affidavits before ruling.
[11] See Miss. Const. Art. 3, § 4, et seq. (1817); Miss. Const. Art. 3, § 4, et seq. (1832); Miss. Const. Art. 4, § 1, et seq. (1869); and Miss. Const. Art. 4, § 33, et seq. (1890).
[12] See particularly, Southwick and Welsh, Methods of Constitutional Revision: Which Way Mississippi?, 56 Miss.L.J. 17, 33-47 (1986).
[13] Many of the principles presented in this part have been well articulated in Monaghan, Stare Decisis And Constitutional Adjudication, 88 Colum.L.Rev. 721, 739-767 (1988); and Comment, Constitutional Stare Decisis, 103 Harv.L.Rev. 1344 (1990).
[14] See, e.g., Dworkin, Law's Empire 133 (1986); Dworkin, Taking Rights Seriously 113 (1977); Bennett, Objectivity In Constitutional Law, 132 U.Pa.L.Rev. 445, 464, 473, 483, n. 109 (1984); see also, Noxubee County Executive Committee v. Russell, 443 So.2d 1191, 1197 (Miss. 1983); Chenault v. State, 154 Miss. 21, 35, 122 So. 98, 100 (1928).
[15] The wisdom vel non of repeal of Section 98 and inauguration of a state lottery in Mississippi is a matter beyond judicial ken or concern. Nothing said here should be taken as intimating so much as a whisper what we may think on the matter.
[16] The obligatory citation is Justice Brandeis' dissenting opinion in Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 405-408, 52 S.Ct. 443, 446-448, 76 L.Ed. 815, ns. 1-3 (1932).
[17] At least four other states, viz., Maine, Maryland, North Dakota, and Washington, at one time had absolute numerical bases for signature requirements under initiative and/or referendum provisions. C. Kettleborough, The State Constitutions 607-09, 652-53, 1021-24, 1443-44 (1918). Each of these states has since amended its initiative and referendum provisions to delete the numerical requirement and substitute a percentage requirement. E.g., Maine Const. Art. 4, Pt. 3, §§ 17-18 (1819); Maryland Const. Art. XVI, § 3(a) (1867); N.D. Const. Art. III, § 4 (1889); Wash. Const. Art. II, § 1 (1889). Today, none of the states providing for initiative and/or referendum uses numerical requirements for petition signatures. The Book of States, 217-219 (1988-89). The average percentage requirement for signatures on an initiative petition is now from 8 percent to 10 percent.
[18] The 1959 amendments to Section 273 provide: (a) amendments pertaining or relating to the same subject or subject matter may be voted on as one amendment; and (b) a majority of the qualified electors voting directly for or against a proposed amendment is sufficient for passage. Miss. Laws, Ch. 78 (1959).

Adoption of the 1959 amendments to Section 273 marked the resolution of a conflict between Governor J.P. Coleman and certain members of the State Legislature, who were led by House Speaker Walter Sillers. Governor Coleman, an ardent supporter of state constitutional reform, convened a special session of the State Legislature in November of 1957, asking that the Legislature adopt a resolution calling for a constitutional convention. House Speaker Sillers advocated that changes to the State Constitution should only be made through the amendment process. Governor Coleman's resolution was defeated, and the Legislature adjourned.
During the 1958 Regular Session, Governor Coleman and House Speaker Sillers reached a compromise. The State Legislature adopted a concurrent resolution proposing the changes to Section 273 outlined above. Miss. Laws, Ch. 629 (1958). The proposed amendments were ratified by a constitutional majority of those voting at the August 26, 1958, statewide election. In 1959, the State Legislature inserted the amendments to Section 273 into the State Constitution. Miss. Laws, Ch. 78 (1959).
[19] In representing the Secretary of State and the State of Mississippi in Power, the Office of the State Attorney General appears not to have urged that the claims raised by Plaintiff Stokes V. Robertson's petition were precluded by doctrines of bar, merger, collateral estoppel, or res judicata. See Robertson v. Power, et al, (Oct. 8, 1922, Hinds County Circuit Court) (Potter, J.), reprinted in Jackson Daily News, p. 6, cols. C-E (Oct. 9, 1922), a copy of which is included in the Appendix, Part II, infra; Power v. Robertson, 130 Miss. 188, 190-98, 93 So. 769 (1922) (summary of briefs of defendants-appellants).
[20] In 1914, women were effectively disenfranchised under what was then Section 241 of the Mississippi Constitution of 1890, allowing "every male inhabitant" who met certain requirements to be an elector. Miss. Const. § 241 (1890), reprinted in Hemingway's Miss. Code Ann., p. 226 (1917). Only after 1920, with the adoption of the Nineteenth Amendment to the United States Constitution, were women allowed to vote.
[21] "... until the passage of the Voting Rights Act in 1965, use of racially discriminatory tests and devices effectively excluded black people in Mississippi from exercise of the franchise." Mississippi v. United States, 490 F. Supp. 569, 575 (D.D.C. 1979) (three-judge court), aff'd, 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980).