# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-01284-SCT

*FALCO LIME, INC., L & L AVIATION, INC., LARRY L. LAMBIOTTE, J. FRED FARRELL, LETOURNEAU, INC., LAWSON'S AVIATION SERVICE, INC., JOHN G. PETERSON d/b/a VICKSBURG ENGINEERING & MANUFACTURING, NASSOUR AVIATION, INC., J. MICHAEL NASSOUR, RICHARD TUCKER d/b/a AVCON, BENNY MAY d/b/a PILOT SERVICES CO., CHARLES WAYNE BROWN d/b/a SOUTH DELTA AVIATION, FRANK A. MAY, GENERAL AVIATION SERVICES OF MISSISSIPPI, INC., CAPPAERT ENTERPRISES, A LIMITED PARTNERSHIP, CAPPAERT MANUFACTURED HOUSING, INC., MICHAEL L. CAPPAERT AND ERNEST G. THOMAS*

*v.*

*THE MAYOR AND ALDERMEN OF THE CITY OF VICKSBURG*

| | |
|---|---|
| DATE OF JUDGMENT: | 6/30/1999 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK, JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | KENNETH M. HARPER |
| | HENRY DEAN ANDREWS |
| ATTORNEYS FOR APPELLEES: | JOHN L. MAXEY, II |
| | JOHN F. HAWKINS |
| | CHRISTINA CARROLL |
| | TIMOTHY DALE CRAWLEY |
| | NANCY DAVIS THOMAS |
| | P. SHARKEY BURKE, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 10/24/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

### NO. 1999-CA-01277-SCT

*THE MAYOR AND ALDERMEN OF THE CITY OF VICKSBURG, ROBERT M. WALKER, INDIVIDUALLY, SAMUEL D. HABEEB, INDIVIDUALLY AND GERTRUDE A. YOUNG, INDIVIDUALLY*

*v.*

*FALCO LIME, INC., L & L AVIATION, INC., LARRY L. LAMBIOTTE, J. FRED FARRELL, LETOURNEAU, INC., LAWSON'S AVIATION SERVICE, INC., JOHN G. PETERSON d/b/a VICKSBURG ENGINEERING & MANUFACTURING, NASSOUR AVIATION, INC., J. MICHAEL NASSOUR, RICHARD TUCKER d/b/a AVCON, BENNY MAY d/b/a PILOT SERVICES CO., CHARLES WAYNE BROWN d/b/a SOUTH DELTA AVIATION, FRANK A. MAY, GENERAL AVIATION SERVICES OF MISSISSIPPI, INC., CAPPAERT ENTERPRISES, A LIMITED PARTNERSHIP, CAPPAERT MANUFACTURED HOUSING, INC., MICHAEL L. CAPPAERT AND ERNEST G. THOMAS*

| | |
|---|---|
| DATE OF JUDGMENT: | 7/7/1999 |
| TRIAL JUDGE: | HON. FRANK G. VOLLOR |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN L. MAXEY, II |
| | JOHN F. HAWKINS |
| | CHRISTINA CARROLL |
| | TIMOTHY DALE CRAWLEY |
| | NANCY DAVIS THOMAS |
| | P. SHARKEY BURKE, JR. |
| ATTORNEYS FOR APPELLEES: | KENNETH M. HARPER |
| | HENRY DEAN ANDREWS |
| | WES W. PETERS |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED IN PART; REVERSED & RENDERED IN PART; REVERSED & REMANDED IN PART - 10/24/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, JUSTICE, FOR THE COURT:**

¶1. Two cases are consolidated in the present matter. In the first case, Mayor Robert M. Walker, and aldermen Samuel D. Habeeb and Gertrude A. Young of the City of Vicksburg (hereinafter "the Board") appeal the July 7, 1999, judgment of the Warren County Circuit Court, which permanently enjoined the Board from closing the Vicksburg Municipal Airport (hereinafter "VKS")[1] "until such time as other adequate facilities are provided which can accommodate all of the aircraft at VKS to include adequate

hangers [*sic*] for those aircraft hangered at VKS, and can handle the same aircraft load without flooding, crowded taxiways and apron, or other safety hazards." The Board also appeals the circuit court's entry of partial summary judgment against it on December 14, 1998, in which the court found that the Board was required to create a "separate corporate authority" under Miss. Code Ann. §§ 61-3-5 or 61-3-7 before it could "act under the Airport Authorities Law" to jointly operate the Vicksburg-Tallulah Regional Airport ("VTR") with Warren County and a Louisiana city and parish.

¶2. A host of Vicksburg businesses, as shown in the style of this case, and for convenience and clarity referred to as "Falco" after Falco Lime, Inc., the party first named therein, filed a cross-appeal. Falco sought not only to reverse the closure of VKS but to recover from the members of the Board all funds appropriated by them for VTR as well as the reasonable attorney fees and costs expended by Falco in litigating this action. The circuit court refused to find the Board personally liable in their individual capacities for either funds or fees, and Falco asks this Court to reverse the trial court's judgment.

¶3. The second case consolidated in this appeal is Falco's own appeal from another judgment of the Warren County Circuit Court, dated June 30, 1999, which dismissed Falco's appeal of the Board's decision to create a municipal airport authority and to appoint two commissioners to that authority who allegedly were in violation of section 109 of our state constitution.

## FACTS AND PROCEEDINGS

¶4. In 1950, VKS was opened to the public. The airport was built on property purchased from G.E. and Belvie Bobb in 1947 for $47,350.00. The warranty deed for the property made no mention of the land's intended use.

¶5. Beginning in 1983, four political subdivisions (the City of Vicksburg and Warren County, Mississippi, and the City of Tallulah and Madison Parish, Louisiana) agreed to create and operate a new, more modern airport, VTR. They agreed to create a five-member board that would oversee VTR and be its funding vehicle. This agreement specifically cited § 61-3-67 of the Mississippi Code as authority. A new agreement in 1997 between the same parties also cited the same statute.

¶6. The 1997 agreement included the statement that Vicksburg "agrees to cease operating or providing funds for [VKS] as an airport from and after April 1, 1998." On February 25, 1998, the Board voted two to one to stop financing VKS and to close it, effective March 31, 1998.

¶7. The "Falco" parties, all of whom used VKS or otherwise benefitted from it, filed a flurry of actions in chancery, circuit, and county courts on March 6, 1998, seeking to keep VKS open and to recover from the Board in their individual capacities all the tax money that the Board had expended on VTR, as well as Falco's reasonable attorney fees and expenses. The circuit court considered these claims under Falco's bill of exceptions (seeking to permanently enjoin the closure) as well as under its amended complaint (seeking to enjoin the closure and to impose personal liability). The circuit court granted a temporary restraining order on March 23, which was converted to a preliminary injunction on April 20. In December 1998, it granted partial summary judgment against the Board, ruling that the Board could not conduct joint operations with Louisiana entities or fund VTR unless and until the Board created a separate airport authority. Sections 61-3-5 and 61-3-7 were cited by the circuit court as justifying this ruling.

¶8. In March, 1999, while the remainder of the case was pending, the Board voted to create a municipal

airport authority and appointed five commissioners to it. Falco responded with a new suit, heard by the same circuit court.[(2)] The new suit alleged that the Board's creation of a municipal, as opposed to a regional, authority for its dealings with VTR was contrary to Mississippi law, and that two of the appointed commissioners were ineligible for service due to section 109 conflicts.

¶9. In the first action, an opinion was entered on June 3, 1999, which concluded that (1) the Board acted arbitrarily and capriciously in closing VKS; (2) VKS had been dedicated by implication to use as a public airport; (3) the Board would be permanently enjoined from closing VKS until VTR's facilities met the court's approval; (4) no writ of prohibition or mandamus would be issued; and (5) the Board's members were not personally liable for funds spent on VTR in accord with the 1997 agreement, or for Falco's attorney fees and costs.

¶10. In the second action, on June 30, 1999, the other judge upheld the Board's creation of a municipal airport authority, found no evidence of section 109 violations, and dismissed the appeal as well as the Board's then-moot motion to stay.

¶11. Appealing from the first action, the Board assigns the following errors (edited):

**I. Whether Falco's exclusive remedy was by notice of appeal and bill of exceptions as per § 11-51-75, not by a suit for a temporary restraining order and preliminary injunction.**

**II. Whether the Board acted without substantial evidence in closing VKS.**

**III. Whether VKS was dedicated by implication or otherwise to use as a public airport.**

**IV. Whether the Board could enter into a joint operations agreement without forming a separate airport authority.**

**V. Whether the circuit court erred in issuing its permanent injunction.**

¶12. On cross-appeal, Falco adds the following assignments of error (edited):

**VI. Whether the Board's members should have been held personally liable for taxes spent on VTR.**

**VII. Whether the Board's members should have been held personally liable for taxes spent on their attorney fees and costs.**

¶13. Appealing from the judgment issued in the second case, Falco assigns the following errors (edited):

**VIII. Whether the circuit court erred in affirming the Board's creation of a municipal airport authority.**

**IX. Whether section 109 violations were committed in appointing commissioners to the authority.**

**X. Whether the circuit court committed reversible error in denying Falco a meaningful opportunity to be heard on the merits of its bill of exceptions.**

¶14. For the reasons set forth below, we reverse and render in part, remand in part, and affirm in part the

trial court's decision in the first case and affirm the trial court in the second case.

## DISCUSSION

**I. Whether Falco's exclusive remedy was by notice of appeal and bill of exceptions as per § 11-51-75, not by a suit for a temporary restraining order and preliminary injunction.**

¶15. The Board complains that in the present matter, the circuit court acted as a trial court, allowing extensive discovery and an 11-day trial (generating 17 volumes of testimony), rather than as an appellate court that would have confined itself to reviewing the bill of exceptions. It argues that because Falco's complaint was in reality a challenge to the Board's legislative act in ordering VKS closed, the bill of exceptions was the only proper means of proceeding. It also cites as error the circuit court's grant of temporary and permanent injunctions against the closure of the airport.

¶16. Miss. Code Ann. § 11-51-75 (2002) reads in pertinent part:

> Any person aggrieved by a judgment or decision of the board of supervisors, or municipal authorities of a city, town, or village, may appeal within ten (10) days from the date of adjournment at which session the board of supervisors or municipal authorities rendered such judgment or decision, and may embody the facts, judgment and decision in a bill of exceptions which shall be signed by the person acting as president of the board of supervisors or of the municipal authorities. The clerk thereof shall transmit the bill of exceptions to the circuit court at once, and the court shall either in term time or in vacation hear and determine the same on the case **as presented by the bill of exceptions** as an appellate court, and shall affirm or reverse the judgment. If the judgment be reversed, the circuit court shall render such judgment as the board or municipal authorities ought to have rendered, and certify the same to the board of supervisors or municipal authorities.

(emphasis added). This Court has held that "judgment or decision" embraces "any act of a county or municipality leaving a party aggrieved . . . [where] all issues of the controversy are finally disposed of by order of the City Council." ***S. Cent. Turf, Inc. v. City of Jackson***, 526 So. 2d 558, 561 (Miss. 1988). Where a plaintiff's action is "in form and substance, and for all purposes, an appeal from a decision" of a municipality, "exclusive jurisdiction [is] in the circuit court pursuant to § 11-51-75." ***Id.***

¶17. Because the action is an appeal, the circuit court sits only as an appellate court, and may consider no evidence presented outside the bill of exceptions. *See, e.g.,* ***Wilkinson County Bd. of Supervisors v. Quality Farms, Inc.***, 767 So. 2d 1007, 1011 (Miss. 2000); ***Stewart v. City of Pascagoula***, 206 So. 2d 325, 328 (Miss. 1968) ("[t]he circuit court can only consider the case as made by the bill of exceptions. This is the only record before the circuit court, as an appellate court"). This rule has been in place for over 150 years: "An appeal by bill of exceptions would necessarily confine the revising Court to the matters of law arising upon the exceptions." ***Yalabusha County v. Carbry***, 11 Miss. 529, 548 (1844), *overruled on other grounds by* ***Dismukes v. Stokes***, 41 Miss. 430, 435 (1857), *quoted in* ***Bowling v. Madison County Bd. of Supervisors***, 724 So. 2d 431, 437 (Miss. Ct. App. 1998).

### *(A) Injunctive relief under § 11-51-75*

¶18. Regarding the injunctions, the Board refers us to our decision in ***Benedict v. City of Hattiesburg***, 693 So. 2d 377, 381 (Miss. 1997), in which we stated that "inadequacy of the remedy at law is the basis on which the power of injunction is exercised. An injunction will not issue when the complainants have a

complete and adequate remedy by appeal." We cited an earlier opinion's holding that injunctive relief was properly denied where an appeal under § 11-51-75 "afforded the complainant a plain, adequate, speedy and complete remedy for a judicial determination of his rights." *Id.* (citing *Moore v. Sanders*, 558 So. 2d 1383 (Miss. 1990)).

¶19. *Benedict* and *Moore* both involved plaintiffs seeking injunctions in chancery court, which somewhat distinguishes them from the present case, in which Falco sought injunctive relief in circuit court, both in its bill of exceptions and in its complaint. Nevertheless, the principle enunciated in those cases is valid: process under § 11-51-75 is the proper avenue for redress of alleged wrongs committed by a municipal board in its legislative capacity.

¶20. Naturally, there will be cases in which it will be necessary to delay the implementation of a municipality's order pending the circuit court's ruling on the bill of exceptions. The correct way to provide such contingent relief is by a stay under Rule 62 of the Mississippi Rules of Civil Procedure. Because such a stay affords "a plain, adequate, speedy and complete remedy" for the plaintiffs' need for contingent relief, no preliminary injunction is appropriate.[(3)]

¶21. The power of the circuit court sitting as an appellate court under § 11-51-75 to grant a permanent injunction is foreclosed by the plain language of the statute. We have quoted that statute's grant of power to the circuit court to resolve appeals: the court "shall affirm or reverse the judgment. If the judgment be reversed, the circuit court shall render such judgment as the board or municipal authorities ought to have rendered, and certify the same to the board of supervisors or municipal authorities." We do not find that this language includes the power to grant a permanent injunction, as that is not a judgment that "the board or municipal authorities ought to have rendered."

¶22. In a case where the plaintiff proved a city's breach of contract, we held that compensatory damages were proper, but this was because the city, presented with the plaintiff's claim, should have honored it and paid him damages for its breach of contract. *City of Durant v. Laws Constr. Co.*, 721 So. 2d 598, 606 (Miss. 1998). Paying claims is a "judgment" that a city might render; issuing an injunction is not.

¶23. The circuit court thus erred in granting preliminary and permanent injunctive relief in this case.

### (B) Trial de novo under § 11-51-75

¶24. Although Falco filed both a bill of exceptions and an ordinary complaint in this matter, to the extent that the bill and complaint plead the same cause of action and seek the same relief, the bill of exceptions is Falco's "exclusive remedy." *Benedict*, 693 So. 2d at 381. Section 11-51-75 governs "appeals from judgments or decisions of municipal authorities," excepting only "where the subject of the appeal is the issuance and sale of bonds." *Id.* at 380 (quoting *S. Cent. Turf*, 526 So. 2d at 561). For appeals from such "judgments and decisions," the "exclusive jurisdiction [is] in the circuit court **pursuant to § 11-51-75**."*Id.* (quoting *S. Cent. Turf*, 526 So. 2d at 561). Because Falco was required to proceed under § 11-51-75, the circuit court was required to function in its appellate role, and no discovery or testimony outside the bill of exceptions should have been allowed on the Board's decision to close VKS.

¶25. Falco points to two apparent exceptions we have created to the scope of § 11-51-75. One is that we have allowed the circuit court to proceed de novo where the board in question failed to conduct any sort of hearing on the matter in issue. *Cook v. Bd. of Supervisors of Lowndes County*, 571 So. 2d 932, 934

(Miss. 1990).

¶26. Our reasoning in *Cook* was as follows: (1) procedure under § 11-51-75 "contemplates the circuit court sitting in an appellate capacity"; (2) this assumption "in turn contemplates the board having held a hearing on the matter in issue, albeit not necessarily one according to the form of a trial in a court of law"; (3) ergo, where no hearing has been held, the circuit court does not sit in its appellate capacity, and that court may thus proceed de novo with respect to the evidence it may consider. *Id.* The Court labeled the action in *Cook* "one of those cases where a party with standing challenges board action on grounds it is ultra vires and where that party is entitled to proceed de novo," though unfortunately it did not provide citations to "those cases." *Id.*[(4)]

¶27. Properly speaking, *Cook* stands for the proposition that where no hearing is held, the action does not really proceed under § 11-51-75 at all. This Court asked itself the question "whether this is one of those matters where judicial review lies only via appeal through" § 11-51-75, and as we have quoted, found instead that the matter was "one of those cases" in which a trial de novo was proper. *Id.*

¶28. In *Cook*, the Lowndes County Board of Supervisors had adopted a resolution changing the provider of the county's ambulance service to a public agency. *Id.* at 933. The existing provider, a private concern, brought to the board's attention § 41-55-1 (private ambulance service to be used where adequate and available) and sought notice of whatever hearing the board would hold "to consider under the statutes the factual criteria granting the preference to private enterprise," but the board held no such hearing. *Id.*

¶29. The board, then, was constrained by a statute placing certain limits on its power to hire any ambulance service at will, and its failure to place on the record its compliance with the statutory constraints was held by this Court to justify a full trial on the merits, rather than proceeding through the bill of exceptions. If *Cook* is to authorize a similar evasion of § 11-51-75 and its evidentiary limitations on the facts before us, similar facts must be shown.

¶30. At its regular meeting on February 25, 1998, the mayor and two aldermen met to address, among other things, the closing of VKS. Alderwoman Young expressed her opposition to closing VKS and her wish that the business interests using the airport could purchase it from the city. Mayor Walker stated that formal closure was needed "to give proper notification to the FAA and others" that Vicksburg would no longer support VKS, insofar as it was already supporting "an airport . . . that happens to be located in Madison Parish" (i.e., VTR). Alderman Habeeb formally moved to cease funding VKS and to close it, was seconded by the mayor, and the motion carried 2-1. Alderman Habeeb then placed on the record his comments that it was essential for the city to choose one airport to fund, and that being one-quarter responsible for funding an airport which was "eligible for a large amount of federal funding for capital projects" was preferable to continuing to fund and operate the old airport (on which the FAA had declined to bestow further federally funded improvements). The mayor added the "expected future use" of the VKS real estate for "industrial job creation purposes."

¶31. Does this amount to a "hearing" for the purpose of determining whether *Cook* applies? To rule otherwise would be to limit the application of § 11-51-75 to those instances where city or county governing boards call in witnesses or interested parties pro and con and listen to them express their opinions before reaching a decision. Such a limitation would drastically limit the application of § 11-51-75 and would also be inconsistent with our already-cited holding that the statute applies to "*any act*" that aggrieves a party. City and county government does not require a straw vote of interested parties whenever an action is

proposed, however pragmatically desirable such participation may be in some cases. Numerous statutes mandate a formal hearing by board or council, but Falco has adduced none of these as controlling the present case. On the contrary, we have stated that a county board need not "recite all the evidence that appeared before them, or . . . set out in full, in their order, all the evidentiary matters pertinent to the controversy" in order for its order to be valid. **Hall v. Franklin County**, 184 Miss. 77, 86, 185 So. 591, 594 (1939) (holding that absence of such evidence in board's order did not justify circuit court in going beyond bill of exceptions).

¶32. We therefore do not find that **Cook** authorized the circuit court to go outside the bill of exceptions in considering Falco's appeal.

¶33. Falco relies on a second apparent exception to the limitations on the circuit court when a bill of exceptions is filed. The circuit court stated in its June 3, 1999, opinion that our own opinion in **Canton Farm Equipment, Inc. v. Richardson**, 501 So. 2d 1098, 1109-10 (Miss. 1987), "held claims for relief under 31-7-57 MCA may be joined with an appeal under 11-51-75 MCA as long as they both arise out of a common nucleus of operative facts." Falco argues that the circuit court correctly allowed the § 31-7-57 and § 11-51-75 causes to be merged in a trial de novo based on this authority.

¶34. Our opinion in **Canton Farm Equipment** has in fact caused no little perplexity to fine minds. *Compare Bowling*, 724 So. 2d at 434 (Southwick, J.) (jurisdictional problems "were posed . . . but not fully explained" in **Canton Farm**) *with id.*, 724 So. 2d at 443 (Coleman, J., dissenting) ("irreconcilable contradiction between" § 11-51-75 and **Canton Farm**). The language relied upon by the circuit court and by Falco is as follows:

> Canton's claim that its own rights have been violated and that it is entitled to relief arises out of a common nucleus of operative fact with the claims asserted under Sections 19-13-37 and 31-7-57. Canton's personal claims are, if nothing else, within the pendent jurisdiction of the court. **That those claims might have been asserted via an appeal under Section 11-51-75 is beside the point.** Because they arise out of a common nucleus of operative fact with the Section 19-13-37/31-7-57 claims, Canton's personal claims may be asserted in this action. Moreover, the substance of whatever advantages the Supervisors were entitled to under Section 11-51-75 has been made available to them inasmuch as Canton brought its action within ten days of the Supervisors' final action.

**Canton Farm**, 501 So. 2d at 1109-10 (emphasis added).

¶35. We have previously interpreted **Canton Farm** differently than have Falco and the circuit court, explicitly stating that in **Canton Farm** "the suit was brought **not as a § 11-51-75 appeal** but as a civil suit for damages against the county supervisors *individually and personally* under Mississippi Code Annotated §§ 19-13-37 and 31-7-57." **S. Cent. Turf**, 526 So. 2d at 561 (boldfacing added). We did not, then, rule in **Canton Farm** that a cause under § 11-51-75 may be joined with another cause in a trial de novo, because there *was* no § 11-51-75 appeal in **Canton Farm**.[5]

¶36. The present case admittedly has a hybrid quality, resulting as it does from the dual filing of an § 11-51-75 appeal with claims for financial restitution from the individual members of the Board for their allegedly illegal expenditures upon VTR. The danger of such combinations is that plaintiffs will be able to jettison the

restrictions of § 11-51-75 simply by tacking on claims against the individual members of the municipal or county board, thus converting a narrowly circumscribed appellate proceeding into a full trial with all the bells and whistles. Even if the individual liability claims were ultimately rejected (as occurred in the present case), the evidentiary genie would be free from its bottle. Section 11-51-75 would then exist primarily as a historical curiosity.

¶37. Where the circuit court finds before it a § 11-51-75 appeal that "arises out of a common nucleus of operative fact" with claims that would ordinarily be resolved by a trial de novo, the better procedure is to function first in its appellate capacity and hear the § 11-51-75 appeal based on the bill of exceptions, and then proceed to the other claims (and the evidence related to them) only if the resolution of the appeal leaves them unresolved. In this manner, the requirements of the statute are met, and the circuit court avoids being presented with extraneous material that might compromise its duty to reach its appellate judgment solely on the bill of exceptions before it.

¶38. This procedure clarifies our interpretation, in *Laws*, of an earlier case in which the plaintiff had failed to file a bill of exceptions but claimed to be entitled to damages under a separate statute. *Laws*, 721 So. 2d at 605 (discussing *McIntosh v. Amacker*, 592 So. 2d 525 (Miss. 1991)).

> While failing to bring the appeal under [§ 11-51-75], McIntosh did have a claim under §§ 65-7-67 which provides for damages. Thus, McIntosh should have complied with the bill of exceptions requirement in §§ 11-51-75. After compliance with §§ 11-51-75, McIntosh would have been allowed a jury trial under §§ 65-7- 67. Thus, pursuant to §§ 11-51-75, we could rule on the bill of exceptions **and then** remand the case to follow the provisions in §§ 31-3-21.

*Id.* (emphasis added). At the circuit court level, McIntosh could have filed his bill of exceptions, and if he obtained a favorable ruling, he could then have gone on to present additional evidence on his entitlement to damages. Such a procedure preserves both substantial justice and § 11-51-75.

¶39. We therefore find that the circuit court erred in conducting a trial de novo on the appeal before it. Does this amount to reversible error?

¶40. Our procedural rules forbid disturbing a judgment on the basis of error unless failing to do so "appears to the court inconsistent with substantial justice." Miss. R. Civ. P. 61. We have specifically held in regard to § 11-51-75's forerunner statute that the circuit court's admission of evidence beyond the bill of exceptions was harmless error where the bill sufficed for the circuit court to have reached the same conclusion. *Hall*, 184 Miss. at 87, 185 So. at 595. Therefore, we examine the record which was properly before the circuit court in order to determine whether it committed harmless or reversible error.

## II. Whether the Board acted without substantial evidence in closing VKS.

¶41. The Board maintains that a properly deferential review by the circuit court under § 11-51-75 would have affirmed its decision to close VKS. Falco contests this assertion.

¶42. We apply the same standard of review to the Board's legislative act as we apply in our review of administrative agency decisions. *Barnes v. Bd. of Supervisors, DeSoto County*, 553 So. 2d 508, 511 (Miss. 1989). Such decisions or orders are to be upheld unless "the agency order was unsupported by substantial evidence; was arbitrary or capricious; was beyond the agency's scope or powers; or violated the constitutional or statutory rights of the aggrieved party." *Bd. of Law Enforcement Officers Standards &*

***Training v. Butler***, 672 So. 2d 1196, 1199 (Miss. 1996). Under issue II, we will consider the substantial-evidence/arbitrary-and-capricious parts of this test; issues III and IV will address the legal authority for the Board's action.

¶43. We consider the substantial evidence requirement to have been met when the record includes "such relevant evidence as reasonable minds might accept as adequate to support a conclusion," which must be "more than a 'mere scintilla' of evidence." ***Johnson v. Ferguson***, 435 So. 2d 1191, 1195 (Miss. 1983) (citation omitted).

¶44. Whether a decision is arbitrary and capricious seems to have melted somewhat into the substantial evidence standard, despite the disjunctive "or" in the above quotation from ***Butler***: "This Court has held that 'a holding which is supported by substantial evidence cannot be arbitrary and capricious.' " ***Miss. Bureau of Narcotics v. Stacy***, 817 So. 2d 523, 526 (Miss. 2002) (quoting ***McDerment v. Miss. Real Estate Comm'n***, 748 So. 2d 114, 117 (Miss. 1999)). We have also defined "fairly debatable" as mutually exclusive with "arbitrary and capricious." ***Id.*** at 526-27 (citing ***City of Biloxi v. Hilbert***, 597 So. 2d 1276, 1281 (Miss. 1992)).

¶45. In discussing whether the Board's February 1999 meeting constituted a "hearing," we have already recounted the nature of the Board's decision to close VKS. The Board had committed itself to funding VTR, considered it superfluous to operate two airports, and noted that FAA funding might be available for VTR but would not be forthcoming for VKS. The mayor also expressed the hope that closing VKS would free up land for industrial purposes. The Board also acted pursuant to its 1997 commitment to its VTR partners to close VKS.

¶46. We cannot hold that these reasons do not amount to substantial evidence in favor of closing VKS or that the Board's decision to close VKS was not fairly debatable. That decision, therefore, was neither arbitrary nor capricious. It was a step in a long-term plan that would arguably be in the city's interest.

¶47. Objecting to the Board's failure to consult personally with the users of VKS before reaching the decision to close it, Falco overlooks the close parallel to another case in which this Court ruled that citizens are not entitled to any "right to reasonable advance notice and the opportunity to be heard before such legislative actions may be taken." ***In re Validation of $7,800,000 Combined Util. Sys. Revenue Bond, Gautier Util. Dist., Jackson County***, 465 So. 2d 1003, 1008 (Miss. 1985).

¶48. Falco strenuously insists on the folly and imprudence of the Board's decision, an evaluation wholly irrelevant to the appellate review of the Board's decision:

> It is not the function of the circuit court on appeal from an administrative agency to determine whether the action of the agency is right or wrong, correct or incorrect, wise or unwise, advisable or best fitted to the situation involved. If there is substantial evidence to sustain the legal action of the legislative agency, the court will not substitute its judgment for that of the agency.

***County Bd. of Educ. of Alcorn County v. Parents & Custodians of Students at Rienzi Sch. Attendance Ctr.***, 251 Miss. 195, 208, 168 So. 2d 814, 819 (1964). "Power to make the order, and not the mere expediency or wisdom of having made it, is the question." ***Id.*** at 207, 168 So. 2d at 819 (citation omitted). The relative merits of VKS and VTR are not a subject for second-guessing, let alone micro-management, by the courts of this state. If the Board acted foolishly, it is for the voters of the city of

Vicksburg to rebuke them by the political process, not for a faction of interested parties to override the elected officials' judgment by resort to the judicial process. *See Gautier*, 465 So. 2d at 1019 ("discontent with these determinations is susceptible of redress through the political process only, saving only [the] due process right to be heard in a judicial forum on the constitutionality and ultra vires question"). Indeed, members of municipal and county governing boards are even more directly accountable to the voters than are the members of most administrative agencies.[(6)]

¶49. We thus hold that the circuit court erred in finding that the Board acted arbitrarily and capriciously in ordering VKS closed.

### III. Whether VKS was dedicated by implication or otherwise to use as a public airport.

¶50. We now turn to consider whether legal authority to close VKS was absent. Falco argues, and the circuit court ruled, that the land constituting VKS was dedicated by implication to use as an airport, and that the Board thus acted illegally in closing VKS.

¶51. Section 61-5-9 states in pertinent part that "every municipality may by sale, lease or otherwise, dispose of any airport, air navigation facility or other property . . . acquired pursuant to the Municipal Airport Law." Moreover, § 21-17-1 is a general statute empowering municipalities to "purchase and hold real estate . . . and to sell and convey any real and personal property owned by it."

¶52. The Municipal Airport Law, presently codified as §§ 61-5-1 to 61-5-49, was in place when the City of Vicksburg bought the land on which VKS is located, and Falco has not alleged that the purchase was not "pursuant to the Municipal Airport Law."

¶53. Falco instead argues that the Board was not authorized to close VKS, because for a municipality to dispose of property, "the property must no longer be needed by the public for the purpose for which it was intended." The lengthy block quote with which Falco backs up this assertion includes the statement that political subdivisions "cannot dispose of public property, unless with the formal sanction of the State." *Am. Oil Co. v. Marion County*, 187 Miss. 148, 156, 192 So. 296, 298 (1939). The formal sanction of the State has been demonstrated by §§ 61-5-9 and 21-17-1.

¶54. The other Mississippi case relied upon by Falco is *City of Louisville v. Hull*, 292 So. 2d 177 (Miss. 1974), in which we recognized the notion of dedication by implication. *Id.* at 179. The plaintiffs had argued that Louisville had dedicated by implication a plot of land for use as a public park and that the city was thus prohibited from erecting a building on the park site. *Id.* at 178. We stated that proof of such implied dedication must be "clear, satisfactory and unequivocal," but did not enlarge on what would constitute such proof. The fact that the city had used portions of the land in question for various purposes was held dispositive of any implied dedication even of the portion which continued to be used for a public park. *Id.* at 180. *Hull* has not been cited by this or any other court since it was handed down, so today is our first opportunity to interpret it.

¶55. Confining our review to the bill of exceptions, we fail to see any clear, satisfactory, and unequivocal evidence of such an implied dedication. Indeed, part of the land bought for VKS has been used for a golf course at least since 1971, which apparently brings the present facts into line with *Hull*.

¶56. The fact that the city originally purchased the VKS land for use as an airport is irrelevant under *Hull*, since the city in that case originally purposed to use the land as a park. *Id.* at 178 (certificates of

indebtedness "issued 'for the purchase of a public park' "). Nor is it important that Falco and others continue to use VKS; the park in ***Hull*** was being used as a park up to the city's decision to erect a building on it.

¶57. Thus, we do not find "clear, satisfactory and unequivocal" proof of implied dedication in the present case. The circuit court erred in finding otherwise.

### IV. Whether the Board could enter into a joint operations agreement without forming a separate airport authority.

¶58. In its order granting Falco partial summary judgment, the circuit court ruled that Vicksburg could not "act under the Airport Authorities Law" without first creating "a separate corporate authority under either 61-3-5 or 61-3-7 MCA. These statutes are not merely idle provisions, but serve an essential, critical, and indispensable function of protecting the city from lawsuits, tort, and otherwise in the Courts of Louisiana." The court went on to state that § 61-3-67 "clearly requires the creation of an authority before any joint operation with a public agency of an adjoining state." While the Board has gone on to create an authority (which became the subject of the second case consolidated here), it appeals this portion of the judgment.

¶59. We have yet to interpret our statutes on joint operations of airports. Section 61-3-67 reads in full:

> For the purposes of sections 61-3-67 to 61-3-75, unless otherwise qualified, **the term "public agency" includes municipality and authority**, each as defined in this chapter, any agency of the state government and of the United States, **and any municipality, political subdivision and agency of an adjoining state**. The term "governing body" includes the commissioners of an authority, the governing body of a municipality, and the head of an agency of a state or the United States if the public agency is other than an authority or municipality.

> All powers, privileges, and authority granted by this chapter **may** be exercised and enjoyed **by an authority** jointly with any public agency of this state, **and jointly with any public agency of any adjoining state or of the United States** to the extent that the laws of such other state or of the United States permit such joint exercise of enjoyment. Any agency of the state government, when acting jointly with any authority, may exercise and enjoy all the powers, privileges, and authority conferred by this chapter upon an authority.

(emphasis added). This statute addresses the powers to be exercised "by an authority," which appears to be what the circuit court had in mind in issuing its judgment. That reading is potentially complicated by the word "may," which implies a permissive rather than a mandatory reading: just because powers may be exercised by an authority, that does not necessarily mean that only an authority may exercise those powers.

¶60. Of course, we might be placing too much emphasis on the word "may," except that a reading of the next statute following § 61-3-67 suggests otherwise. That statute reads:

> **Any two or more public agencies may enter into agreements with each other for joint action pursuant to the provisions of section 61-3-67.** Each agreement shall specify its duration, the proportionate interest which each public agency shall have in the property, facilities, and privileges involved in the joint undertaking, the proportion of costs of operation, etc., to be borne by each public agency, and such other terms as are deemed necessary or required by law. The agreement may also provide for amendments and termination; disposal of all or any of the property, facilities, and privileges jointly owned, prior to or at such time as said property, facilities, and privileges, or any part

thereof, cease to be used for the purposes provided in this chapter, or upon termination of the agreement; the distribution of the proceeds received upon any disposal, and of any funds or other property jointly owned and undisposed of; the assumption or payment of any indebtedness arising from the joint undertaking which remains unpaid upon the disposal of all assets or upon a termination of the agreement; and such other provisions as may be necessary or convenient.

(emphasis added). "Public agency" in § 61-3-69 means "municipality or authority," according to § 61-3-67. So, one municipality can enter into an agreement with another municipality. If only authorities could enter into joint operations agreements, as Falco's reading of § 61-3-67 would have it, then § 61-3-69 would be nonsensical. The plain text of § 61-3-67 states that an authority can in fact enter into a joint operations agreement with another "public agency," which means that a municipality can enter into an agreement directly with an authority, without the need for an intermediary. The only harmonious reading of the two statutes is that either an authority or a municipality can enter into a joint operations agreement.

¶61. This reading makes additional sense when one notes that § 61-3-71 requires the public agencies to form a joint board. It would be a parody of bureaucratic imbrication for the Legislature to require a municipality to create a board solely in order that *that* board might create *another* board, and absent direct statutory language compelling such a reading, we will not construe these otherwise clear statutes as so ordering. *See USF&G Co. v. Conservatorship of Melson*, 809 So. 2d 647, 660 (Miss. 2002) (this Court will not construe statutes to impute absurd purpose to Legislature).

¶62. On this reading, Vicksburg was mistaken in citing only § 61-3-67 (and not § 61-3-69 as well) when it entered into its joint operations agreement, but that is not reversible error.[7] We affirm where an agency or lower court reaches the right result for the wrong reason *Jackson v. Fly*, 215 Miss. 303, 311, 60 So. 2d 782, 786 (1952); *see Fulton v. Robinson Indus., Inc.*, 664 So. 2d 170, 176 (Miss. 1995).

¶63. As for the circuit court's anxiety about the city's potential tort liability, the joint board may be meant in part to insulate against such hazards, though we do not address that potential issue today. In any case, as we have already noted, it is not the place of the judiciary to countermand legislative acts because the court regards them as imprudent, unwise, or worse. We do not (thankfully) exercise a super-veto over the municipalities, boards of supervisors, and administrative agencies of this State on the basis of our mere agreement or disagreement with their policies.

¶64. Falco expresses supreme indignation over the Board's committing city revenues to an airport located in the territory of another sovereign State, subject to the laws thereof, and partially controlled by the political subdivisions thereof. That indignation is unrelated to the proper disposition of this case. We have boldfaced the language of § 61-3-67 which justifies the Board in forming a joint authority with public agencies of other states; § 61-3-75 provides for joint funding of joint authorities, which obviously would be empty shells without monies from the cooperating public agencies. Falco's complaint is properly lodged with their representatives in the Legislature, not with the courts.

¶65. The dissenting opinion detects "an underlying tenet . . . which is that Miss. Code Ann. §§ 61-3-67 through 61-3-75 presuppose that the land for the airport at issue would be located in Mississippi, not outside of our borders." This "underlying tenet" was not expressed by the Legislature, which evidently did not take the dire attitude towards cooperation with out-of-state entities that Falco and the dissenting opinion have adopted. Whether the Legislature was prudent in setting no special limits on interstate operations is not for any court to dictate. It is our job to apply the law as it is written, not to rewrite it in

view of public policy considerations which we think the Legislature failed to address. "Our Constitution provides that if there is a public policy issue to be addressed, it is for the Legislature, not this Court." *Farmer v. B & G Food Enters., Inc.*, 818 So. 2d 1154, 1162 (Miss. 2002) (McRae, P.J., dissenting); *see Kelly v. Miss. Valley Gas Co.*, 397 So. 2d 874, 877 (Miss. 1981) (quoting *Hamner v. Yazoo Delta Lumber Co.*, 100 Miss. 349, 417, 56 So. 466, 490 (1911)):

> The courts have no right to add anything to or take anything from a statute, where the language is plain and unambiguous. To do so would be intrenching upon the power of the legislature. Neither have the courts authority to write into the statute something which the legislature did not itself write therein, nor can they ingraft upon it any exception not done by the lawmaking department of the government.

¶66. Similarly, if (as Falco insists) Vicksburg has been awarded the short end of the stick in its dealings with the City of Tallulah and with Madison Parish, that is a matter for the voters to take up with their elected representatives. As we stated in another context, "it seems more consonant with respect for our democratic institutions that the people be given a chance to pass judgment on those said-to-be-recalcitrant legislators before we seriously consider the judicial end run." *State ex rel. Moore v. Molpus*, 578 So. 2d 624, 636 (Miss. 1991).

¶67. We therefore hold that the circuit court erred in holding that the Board was required to create a municipal or regional airport authority in order to enter into joint operations with public agencies of the State of Louisiana.

### V. Whether the circuit court erred in issuing its permanent injunction.

¶68. We have already addressed (under issue I) the impropriety of injunctive relief pursuant to § 11-51-75. In any event, since we have found that the Board acted within its power in ordering VKS closed, there is no proper basis for the injunction. On remand, the circuit court should lift the injunction.

¶69. We now turn briefly to Falco's issues on cross-appeal:

### VI. Whether the Board's members should have been held personally liable for taxes spent on VTR.

### VII. Whether the Board's members should have been held personally liable for taxes spent on their attorney fees and costs.

¶70. Our treatment of issues I-IV renders these assignments of error moot, as they were predicated on the supposed illegality of the Board's actions.

¶71. The remaining issues are those from the judgment in the second case, issued on June 30, 1999.

### VIII. Whether the circuit court erred in affirming the Board's creation of a municipal airport authority.

¶72. As we have noted, the Board responded to the circuit court's grant of partial summary judgment against it by appointing a municipal airport authority. Falco appears to cite as error the circuit court's failure to reverse the creation of this authority on the grounds that the Board's purpose was unlawful. This unlawful purpose, insofar as we can determine from Falco's brief, was "to send our tax dollars to another state."

¶73. This issue is repetitive of issue IV, where we quoted extensively from the Airport Authorities Law. Section 61-3-67 allows any authority, be it municipal or regional, to enter into a joint operations agreement. *See* Miss. Code Ann. § 61-3-3 (defining "authority" as "any regional airport authority or municipal airport authority"). The remainder of the Law impliedly and expressly approves the purpose of paying for the airport one has engaged to jointly operate. Short of constructing a runway upon a string of barges anchored down the center of the Mississippi River, it is plain that an airport operated jointly by Mississippi and Louisiana must be located in one sovereign state or the other. The Airport Authorities Law demands no such feat of engineering.

¶74. This assignment of error is thus without merit.

### IX. Whether section 109 violations were committed in appointing commissioners to the authority.

¶75. Falco cites as error that the circuit court ruled against it on this issue because the bill of exceptions was devoid of any evidence to support the claim of a conflict under article 4, section 109 of the Mississippi Constitution.

¶76. In its June 22, 1999, order, the circuit court addressed the section 109 issue:

The Appellants [Falco] also appeal the appointment of the Commissioners for the Airport Authority by the Mayor and Board of Alderman [sic]. The Appellants allege that two (2) of the appointed members of the Airport Authority Commission are constitutionally barred from serving on the Commission. The allegations as alleged are not supported by any evidence before the Court. . . .

Without evidence to the contrary the Court gives deference to the legality of the governing body's appointments. Therefore the Court finding no evidence of an illegal appointment, hereby dismisses said appeal.

Falco had failed in the bill of exceptions to name the persons supposedly in conflict.

¶77. Falco argues that the circuit court heard from the Board's counsel, who admitted the conflict in open court. We repeat that evidence outside the bill of exceptions is not to be considered by the circuit court. *Wilkinson County*, 767 So. 2d at 1011.

¶78. Falco's objection that the circuit court effectively rendered it impossible to sue for a section 109 violation is adequately refuted by our case law, which includes various examples of parties' managing to sue under section 109. *See, e.g., Hinds Cmty. Coll. Dist. v. Muse*, 725 So. 2d 207 (Miss. 1998); *Moore ex rel. Benton County v. Renick*, 626 So. 2d 148 (Miss. 1993); *Towner v. Moore ex rel. Quitman County Sch. Dist.*, 604 So. 2d 1093 (Miss. 1992).

¶79. This assignment of error is thus without merit.

### X. Whether the circuit court committed reversible error in denying Falco a meaningful opportunity to be heard on the merits of its bill of exceptions.

¶80. This assignment of error essentially amounts to Falco's chafing against the limitations imposed by the circuit court's confinement to examining the bill of exceptions before it. Falco cites no authority for the circuit

court's being required to grant a hearing on the bill of exceptions. Instead, it cites the right to due process, i.e., "the opportunity to be heard at a meaningful time and in a meaningful manner." *Dennis v. Dennis*, 824 So. 2d 604, 609 (Miss. 2002). Presumably, Falco means to attack the constitutionality of § 11-51-75.

¶81. The appellant in *Triplett v. Mayor & Bd. of Aldermen of City of Vicksburg*, 758 So. 2d 399 (Miss. 2000), similarly sought to challenge the constitutionality of § 11-51-75 on due process grounds. *Id.* at 401. However, we held that because Triplett had not alleged the unconstitutionality of the statute in his bill of exceptions, the issue was barred from review. *Id.* at 401-02.

¶82. Neither the original nor the corrected bill of exceptions filed in this case raises any issue regarding the constitutionality of § 11-51-75. As in *Triplett*, the issue is thus procedurally barred.

## CONCLUSION

¶83. For the foregoing reasons, we reverse and render the judgment of the Warren County Circuit Court in the first case, insofar as it (1) overturned the Board's order closing VKS, (2) found that VKS had been dedicated by implication to the public for use as an airport, and (3) issued a permanent injunction in the case. We remand the case for the circuit court to lift the permanent injunction. We affirm its judgment insofar as it (4) denied Falco writs of mandamus or prohibition and (5) found that the Board was not personally liable for city revenues expended or for any attorney fees or costs. We affirm the judgment of the Warren County Circuit Court, in the second case, in all respects.

¶84. **AFFIRMED IN PART; REVERSED & RENDERED IN PART; REVERSED & REMANDED IN PART.**

> **PITTMAN, C.J., SMITH, P.J., WALLER AND CARLSON, JJ., CONCUR. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

> **McRAE, PRESIDING JUSTICE, DISSENTING:**

¶85. For the majority to hold that the City of Vicksburg has the authority under any of our laws to funnel, out of state and without controls, public money to Louisiana for the VTR is disingenuous. Who will have control over the money? Which states' laws apply? Will the employees of the VTR be covered under the laws of Mississippi or Louisiana? Will the Mississippi Tort Claims Act apply in Louisiana? My concern is that our laws do not apply in Louisiana. Accordingly, I dissent.

¶86. In his December 14, 1998, opinion, Circuit Judge Vollor held that the City "**must** create a separate corporate authority under either 61-3-5 or 61-3-7 MCA." The stated purpose for creating an authority was so funding could continue to flow from Vicksburg to the VTR in Louisiana. The Board voted unanimously to create the municipal airport authority, pursuant to Miss. Code Ann. § 61-3-5, and Circuit Judge Patrick upheld that decision. I would reverse that decision because neither judge recognized or addressed the inability of the Board, under Miss. Code Ann. §§ 61-3-5 or 61-3-7, to create an airport authority, municipal or regional, with out of state public entities such as Madison Parish and the City of Tallulah in Louisiana.

¶87. Miss. Code Ann. § 61-3-5 states: "Any municipality . . . by resolution, may create a public body

corporate and politic, to be known as a municipal airport authority . . ." Miss. Code Ann.§ 61-3-7(1) states,

> **Two (2) or more municipalities** . . . by resolution of each, may create a public body, corporate and politic, to be known as a regional airport authority which shall be authorized to exercise its functions upon the issuance by the Secretary of State of a certificate of incorporation.

(emphasis added). Miss. Code Ann. § 61-3-3(a) defines municipality as,

> any county, supervisors district or supervisors districts, or all that portion of the county lying outside the territorial boundaries of any named city, town or village, and a city, town and village **of this state** . . .

(emphasis added).

¶88. These statutes mean that municipal airport authorities and regional airport authorities may be formed by and between municipalities **of this state**. Miss. Code Ann. § 61-3-3(a) does **not** include entities of **another** state in its definition of municipality. These are Mississippi laws, and they govern Mississippi municipalities seeking to establish an airport. The required municipalities referred to in §§ 61-3-5 and 61-3-7 must be Mississippi municipalities. We cannot make laws that govern the actions of another state's municipalities.

¶89. Therefore, the original municipal airport authority established was invalid since it was between two Mississippi municipalities and two Louisiana municipalities. Judge Patrick's judgment upholding the creation of the municipal authority should be reversed. In accordance with the relevant statutes, the City should be barred from forming either a municipal airport authority, pursuant to Miss. Code Ann. § 61-3-5, or a regional airport authority, pursuant to Miss. Code Ann. § 61-3-7, outside the state of Mississippi with the City of Tallulah, Louisiana, and Madison Parish, Louisiana, because they are not municipalities of this state. The City cannot simply decide to form an airport authority with foreign cities and divert public money derived from our municipal taxes to those cities. This would eliminate any control our state and our taxpayers have over our own public money. Further, any participation the City has with the VTR should be suspended because the City does not have the statutory authority to send Vicksburg tax dollars across state lines.

¶90. The City argues, and the majority agrees, that Miss. Code Ann. § 61-3-15(e) supports sending public money to fund the VTR. However, § 61-3-15(e) is predicated on the assumption that a proper authority was formed. As noted above, a proper authority was not formed in this case. Therefore, the City did not have the authority to send Vicksburg tax dollars to support the operations of the VTR.

¶91. Judge Vollor was correct in holding that the joint operations agreement was unlawful. Two separate acts were passed concerning a municipality's authority to engage in airport related activities, the "Municipal Airport Law," and "The Airport Authorities Act." Miss. Code Ann. §§ 61-3-1, *et seq*,. and 61-5-1 *et seq*., respectively. *See also **Anderson v. Jackson Mun. Airport Auth.***, 419 So.2d 1010, 1011 (Miss. 1982). We noted further, that municipalities are to proceed, and therefore, derive powers and immunities, under one or the other of these statutes, but not both. ***Id.*** The Board attempted to proceed under § 61-3-67

which purportedly permits operation agreements with out-of-state municipalities. *See* Miss. Code Ann. § 61-3-67 (1972).

¶92. However, the trial court failed to recognize an underlying tenet here which is that Miss. Code Ann. §§ 61-3-67 through 61-3-75 presuppose that the land for the airport at issue would be located in Mississippi, not outside of our borders. Applying this statute across the board allows municipalities to contract away public money for the creation of airports in other states. In turn the majority is permitting complete circumvention of the protections the Legislature has codified, namely shielding our political subdivisions from liability and safeguarding our taxpayers' money. Where is the protection? Employees will be citizens of Mississippi and Louisiana as many of the businesses located at VKS will move to VTR. Where do the employees seek relief if they are injured or if their rights are compromised? Will Louisiana laws apply over an entity funded by Vicksburg tax dollars? Neither an airport authority nor the City of Vicksburg can exercise eminent domain in Louisiana. *See* Miss. Code Ann. §§ 61-3-17 (1996) &  21-37-47 (2001).

¶93. We have held that a municipality's ownership and operation of an airport are proprietary or corporate activities which do not exempt it from tort liability. *See **Anderson***, 419 So.2d at 1013. If this were considered a governmental or public function, one could possibly justify the use of public funds for an out-of-state airport. ***Id.*** at 1015-17. However, the discussions in ***Anderson*** further indicate the Legislature's intent to have controls on the use of public funds for proprietary functions. The majority allows the Board to funnel public funds to an airport outside of our borders. Additional steps must be taken to protect such an investment. Namely, the state must approve any such contract or expenditures. *See* Miss. Code Ann. § 21-17-5 (2001) (which takes away the general grant of municipal authority unless specifically authorized by our Constitution or statutes). The manner in which the City attempted to trump the state's authority in this case is not permitted.

¶94. At first blush, § 21-17-5 delegates broad powers to our municipalities, however, not only is this grant limited by § 21-17-5 (2), as mentioned above, this authority applies only to municipal affairs. Operating and maintaining an airport in another state and, moreover, sending public money across state lines has an overwhelming impact not only on Warren County and Vicksburg, but on the entire state. The issue is not solely a municipal affair. It is beyond the realm of municipalities and is more aptly considered as a state matter. Since it is a state matter, it is for the state or its agencies to control, or at least to set the parameters. The Legislature has not addressed expending public monies on an airport or similar operation in another state, and we should not grant such a broad interpretation.

¶95. The record clearly indicates that the purpose of closing the VKS was to pipeline money to the VTR. I disagree with the majority that the circuit court sitting as an appellate court was "foreclosed by the plain language" of Miss. Code Ann. § 11-51-75 (1972) from granting injunctive relief and that Falco was limited to filing a bill of exceptions or requesting a stay under Miss. R. Civ. P. 62 for relief. Rather, I find the immediate need to prevent irreparable harm to the taxpayers of Vicksburg warranted alternative actions and thus Falco was entitled to go beyond § 11-51-75 for relief. Maintaining the status quo until other matters were resolved was imperative in this case. Therefore, I find that the trial court did not err in granting the TRO and later granting the preliminary injunction.

¶96. While Miss. Code Ann. § 11-51-75 provides a remedy for persons aggrieved by a decision of a municipal authority via filing a bill of exceptions, **the statute is not mandatory**, and moreover, injunctive

relief is not extinguished.

¶97. Judge Vollor noted in his June 3, 1999, opinion, that case law has been inconsistent on the matter. Even though I find that the decision to close the airport was appealable under § 11-51-75 in line with ***Benedict v. City of Hattiesburg***, 693 So.2d 377 (Miss. 1997), again, the statute is not dispositive as to the remedies available.

¶98. Also, I disagree with the majority's analysis of ***Canton Farm Equip. Inc. v. Richardson***, 501 So.2d 1098 (Miss. 1987), and instead find it to mean exactly what it says. There, we held that a claim for relief under Miss. Code Ann. § 31-7-57 may be joined with an appeal under Miss. Code Ann. § 11-51-75 if both arise out of a common nucleus of operative facts. ***Id.*** I agree with Judge Vollor that the initial bill of exceptions and the injunction and writ of prohibition or mandamus matters filed in the circuit court arose out of a common nucleus of operative facts; and therefore, it was proper to consolidate the cases. The consolidation permits Falco's seeking of injunctive relief in this case. ***Canton Farm,*** 501 So.2d at 1098.

¶99. Further, the trial court found that the elements for an injunction had been met, and I would affirm those findings. We have held that a trial court judge has the discretion to grant a temporary restraining order, and we will not disturb such a grant unless an abuse of discretion is shown. ***Moore v. Sanders***, 558 So.2d 1383, 1385 (Miss. 1990). Further, a plaintiff has the burden to show there is no complete and adequate remedy at law when seeking a preliminary injunction. ***Id.*** (citations omitted). As the City states in its brief, Falco "opted" to pursue injunctive relief. Under the circumstances, injunctive relief was appropriate as the threatened harm to the taxpayers was immediate and filing a bill of exceptions would not provide complete, adequate and immediate relief. ¶100. Our laws should not be read so expansively as to allow municipal tax dollars to flow freely and without controls or checks and balances. Further, the municipal airport authority created was improper; and therefore, the joint operations agreement was improper. Finally, it was proper for Falco to seek injunctive relief, and the trial court proceeded properly in granting said relief. Without control or authority and keeping in mind the questions raised previously, the majority is simply wrong to hold that public money of a city can be used for an out of state project. Accordingly, I respectfully dissent.

1. FAA location identifiers will be used to identify the airports involved in this case.

2. There are two circuit judges in the Ninth Circuit Court District. One was assigned to the first case and the other to the second case.

3. The dissenting opinion acknowledges the plaintiff's burden to show that no other remedy exists, then says that "Falco 'opted' to pursue injunctive relief," which thus should have been granted. Where a stay under Rule 62 serves the purpose, resort need not be had to the extraordinary remedy of injunctive relief.

4. Nor does our research readily yield a list of them. To the extent that the facts surrounding an action are not in dispute, the claim that it was ultra vires is reviewed de novo as a matter of law, but that is not the same as dispensing with the bill of exceptions.

In deciding the pertinence of § 11-51-75, the ***Cook*** Court appeared somewhat impatient with the issue: "More than eight years ago we declared there was but one form of civil action, and [we] are not about to get hung up on the label Cook placed on the papers it filed in circuit court." ***Cook***, 571 So. 2d at 933. We have consistently held that § 11-51-75 is jurisdictional in nature, *see, e.g.,* ***McIntosh v. Amacker***, 592 So. 2d 525, 526 (Miss. 1991), and to the extent that the Legislature has circumscribed the power of the courts

to review the legislative acts of municipalities and counties, we must adhere to its mandated limitations.

5. The dissenting opinion insists that in *Canton Farm* "we held that a claim for relief under Miss. Code Ann. § 31-7-57 may be joined with an appeal under Miss. Code Ann. § 11-51-75 if both arise out of a common nucleus of operative facts." Rather, as just quoted, this Court held that claims which "might have been asserted via an appeal under Section 11-51-75" could sometimes be brought under § 31-7-57. Nor does the dissenting opinion address this Court's interpretation of *Canton Farm* in *South Central Turf*, an opinion in which the author of *Canton Farm*, like seven other justices of this Court, joined.

6. We observe that, at oral arguments in this matter before this Court, the parties acknowledged that the two Board members who voted to close VKS were no longer serving on the board.

7. The dissenting opinion would hold that, because §§ 61-3-5 and 61-3-7 do not permit operations with out-of-state authorities, no such operations are permitted. Of course, such operations are the subject of § 61-3-67 *et seq.*, so the silence of §§ 61-3-5 and 61-3-7 on joint operations is understandable. As for the claim that "the City cannot simply decide to form an airport authority with foreign cities and divert public money derived from our municipal taxes to those cities," that is actually a pretty good summary of what our joint operations statutes allow, once *cannot* is replaced by *may*.

Although the dissenting opinion expresses anxiety over the joint authority's potentially spending money outside of the Legislature's control, the fact remains that the Legislature passed §§ 61-3-67 to 61-3-75, which specifically address and permit the appropriation of funds. It will not suffice, therefore, to point only to § 21-17-5(2), "which takes away the general grant of municipal authority unless specifically authorized by our Constitution **or statutes**" (emphasis added). Sections 61-3-67 to 61-3-75 are, plainly, "statutes."